8 N.J. Super. 301 (1950)
72 A.2d 536
LILLY K. ALTMAN, PLAINTIFF,
v.
HARRY ALTMAN AND WIFE, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 13, 1950.
*302 Mr. Solomon Lautman, attorney for plaintiff.
Messrs. Feld & Breitner (Mr. Samuel B. Feld), attorneys for defendants.
BIGELOW, J.A.D.
This action is brought on a contract dated February 27, 1940, between the defendants Rose Altman and Harry, her husband, as the party of the first part, and Harry's brother Samuel, and Lilly, his wife, as the party of the second part:
"In the event the party of the first part shall sell the hotel premises owned by it, situated at 206, 208, 210 Eighth Avenue in the City of Asbury Park, New Jersey, the party of the first part does hereby agree to pay the party of the second part a sum of money equal to twenty five percent (25%) of the net profits resulting from the *303 sale of the aforesaid property. It is expressly understood and agreed between the parties hereto that the within contract shall become null and void and of no force and effect if the party of the first part shall not sell the above described premises prior to or at the time of the decease of the party of the second part, namely: LILLY KAROLINE ALTMAN and SAMUEL ALTMAN, her husband. It is also understood, however, that the consideration of the within agreement shall enure to the benefit of the surviving party of the second part upon the death of one or the other of said parties."
Samuel has passed away; Rose and Harry have sold the hotel, and Lilly sues for one-quarter of the profit. The defendants answer that the agreement was usurious, that it was a bonus exacted for a loan of $15,000 (or less) secured by bond and mortgage bearing even date with the contract, February 27, 1940. The bond and mortgage have been paid in full.
The roots of the controversy go back to the spring of 1938, when Samuel Altman advanced to his brother Harry the sum of $5,000. The check for this amount, drawn to Harry's order, was entrusted by Samuel to his lawyer, Mr. Fixler, who gave a receipt stating that the check was received for the following purposes:
"(1) To purchase real estate in the name of the Dietetic Institute, Inc., property to be selected by Harry and Morris Altman and the selection and purchase of the property to be approved by Leo Fixler.
"(2) In the event of the purchase of any property, the same is to be leased by the Dietetic Institute, Inc. to Harry Altman to be operated for the benefit of Harry and Morris Altman, the division of the profits to be in the following manner: Two thirds to Harry and Rose Altman, one third to Morris Altman.
"(3) The lease shall be void upon its transfer, assignment or sale unless the consent to such transfer, assignment, or sale is first obtained from Mrs. Lilly Karoline Altman.
"(4) The terms of the lease shall provide for the payment of a rental at an annual sum sufficient to pay all taxes, interest on the mortgage and interest on the principal sum invested by the Dietetic Institute, Inc. at the rate of four percent together with all other carrying charges, such as insurance, interest and amortization payments on any possible modernization loan which may be made."
A day or so later, Samuel and Lilly, with defendant's daughter Isabelle, sailed for Europe.
*304 Some months earlier the two brothers had considered the purchase of the hotel on Eighth Avenue in Asbury Park, which was owned by the Pine Building and Loan Association Liquidating Corporation. They had learned that the Corporation would accept in payment, or in partial payment, certificates of interest in the Corporation, which could be bought at much less than book value. During March, Harry, aided by Fixler, negotiated with the Corporation with the result that on March 30, 1938, the Corporation entered into contract to sell the property to Harry's wife, the defendant, Rose Altman, for a nominal consideration of $42,000, of which $4,200 was paid on execution of the contract, paid out of Samuel's money, and the balance was payable as follows:
September 1, 1938: Cash $500; certificates of interest having a book value of $5,000.
September 1, 1939: Cash $1,500; certificates of interest having a book value of $15,000.
September 1, 1940: Cash $1,800; certificates of interest having a book value of $14,000.
The contract was taken in the name of Rose rather than the Dietetic Institute, because the Liquidating Corporation preferred to deal with an individual rather than a company without any assets. The certificate of incorporation of the Institute had been filed by Fixler, acting for Samuel, in October, 1937, but nothing further had been done to organize it. In April, Harry asked Fixler to draw the papers for a transfer of the contract to the Institute, and on May 5th he wrote Samuel, advising him of this. But on further study, Harry and Fixler decided that this would introduce an undesirable complication into the business and therefore that the contract should remain in Rose's name, at least until Samuel's return to the United States. Harry communicated this development to Samuel by letter of June 7th.
Meanwhile, on May 25th, Harry wrote Samuel about the lease to be executed by the Dietetic Institute, and said, "We will take a ten-year lease. The rental will be whatever expense it will be to carry the building." Samuel replied, vigorously *305 objecting to a ten-year lease. He would only consent to a term no longer than five years.
Morris Altman, mentioned in the original receipt for the $5,000, was a third brother. He was dropped out of the enterprise within a few months for reasons that are not altogether clear, but are unimportant. For a while, Harry sent him $25 a month for the account of Samuel, and then Morris appears no more in the transaction.
In the week of July 23rd, Harry made his first purchase of certificates of the Building and Loan Association Liquidating Corporation, paying $999, or about 27% of the face value, $3,705. The next month his daughter Isabelle arrived in New York, bringing with her $500 from her uncle to be used in the purchase of the hotel. About the same time, he sent Harry from Zurich a draft for an additional $1,000, and a few weeks later a second $1,000. That made a total of $7,500 advanced by Samuel up to September for the purchase of the hotel. The contract called for a payment of cash March 30 and September 1, 1938, of $4,700 and certificates of $5,000. Since the certificates were acquired at 30 or better, less than $6,200 was required to meet the March and September payments.
Samuel and Lilly returned from Europe toward the end of December, 1938, and had a conference with Harry and Rose which resulted in a sharp dispute. Harry and Rose declined to turn over the property to the Dietetic Institute unless all the capital stock of the Institute was issued, or transferred to them. That is, unless the Institute became their holding company instead of Samuel's. Samuel refused. The impasse continued for nearly a year.
The contract for the purchase of the hotel gave the purchaser, Rose, the right to enter into possession immediately. She would therefore have any profits earned during three summer seasons to help in meeting the purchase price,  1938, 1939 and 1940. These anticipated profits were an important factor in the calculations of the brothers. Samuel had advanced $1,300 more than was necessary to care for the 1938 *306 payments. September, 1939, about $4,700 more money, making $6,000, was required, that is, enough to pay $1,500 in cash and to buy $15,000 in certificates at around 30. Samuel advanced in 1939 only $1,325 in "bonds" (we have no information about them) and $646 in cash. The difference, some $2,725, probably came from the earnings of the hotel in the seasons of 1938 and 1939, although Harry may have scraped together some of it himself.
February, 1940, the brothers reached a settlement. There would be required the following September, to complete payment for the hotel, about $6,000. Samuel had promised about November, 1939, to make a final advance of $5,000, and did advance it, or most of it, within a couple of months (leaving $1,000 to be raised by Harry), so that title could be taken six months ahead of the stipulated day. Samuel also agreed to surrender his equitable title  or claim  to the purchase contract and to the hotel. In return, he demanded (1) a bond and mortgage to Lilly for $15,000, namely, the amount of his advances with interest; (2) an agreement that in the event the dollar were further devalued, Harry and Rose would reimburse Lilly for any loss on the mortgage caused by the devaluation; and lastly (3) the agreement to pay to Samuel and Lilly 25% of the profits upon a resale of the hotel. Samuel, at the last moment, abandoned the devaluation agreement, and on February 27th, the whole matter was consummated. The Liquidating Corporation received the final payment in cash and shares and conveyed the hotel to Rose, and she and Harry executed the bond and mortgage, and the 25% agreement which is in suit.
There appears to be only one controverted matter of fact: Harry and Rose assert that Samuel definitely agreed about February, 1939, to surrender his claim to the property and to take a bond and mortgage for his advances; and that Samuel first demanded the 25% agreement months later, about November, 1939, as a bonus for his last advance of $5,000. Harry's testimony is particularly uncertain. He testified that it was not until a couple of months before February, 1940, *307 that he agreed to pay 25% of the profits in the event of a resale of the hotel, but he also testified that this phase of the settlement was agreed upon early in 1939. His wife testified that Samuel asked for the 25% covenant in January, 1939. That they settled their differences about November of that year.
The plaintiff, Lilly Altman, testified that the covenant was compensation for the defendants' retaining the title instead of putting title in Samuel's company; that it was given in settlement of differences between the parties. I am satisfied that this is the true explanation. From the time in January, 1939, when Harry refused to permit Rose to transfer the property to the Dietetic Institute, until February of the next year when the title passed and the papers were executed, the controversy between the brothers was in process of negotiation. There were tentative agreements reached from time to time on sundry points, but all remained subject to reconsideration until the final signing and delivery of the documents.
The defendants say that they were driven by their necessities to accede to the oppressive terms upon which Samuel insisted; that they could not borrow $5,000 elsewhere, and $5,000 they must have. But observe, they were not obligated to make the final payment to the Liquidating Corporation, the one for which they needed $5,000, until September 1, 1940. Taking as true that part of Harry's testimony that is most favorable to their contention,  they accepted Samuel's terms about December, 1939. They could not possibly know then that they would be unable to borrow the $5,000 from some other money lender before the following September. No pressing necessity forced the defendants to yield to Samuel.
The burden is upon the defendants to establish the facts constituting the usury. It is not enough that the circumstances proved render it probable that there was a corrupt bargain. The defense of usury fails unless it is clearly established by a decided preponderance of evidence. Berdan v. School Trustees, 47 N.J. Eq. 8; affirmed, 48 Id. 309 (1891). The defendants' case falls far short of this standard.
*308 Let us look closer into the consideration for the contract before us. Samuel furnished all the initial payment on the purchase of the hotel, all the payment made in September, 1938, and a part of the payment made in September, 1939, and most of the final payment. Generally, a trust results in favor of him who pays the consideration for a conveyance. Phillips v. Phillips, 81 N.J. Eq. 459; affirmed, 83 Id. 345. The legal title to the chose in action, that is, the contract with the Liquidating Corporation, and the equitable title to the land that Rose had as vendee under the contract, were held by her in the first instance for the use of Samuel. Later, Harry and Rose employed some of their own moneys toward paying the amount due on the contract with the Liquidating Corporation and thereby they gained some interest in the transaction, whether it was a lien for the amount of their advances, or an undivided interest in the contract and in the equitable title to the property. Part of their own funds was the profits from the operation of the hotel from the time Rose and Harry took possession; for to them belonged the profits remaining over what would equal a fair rental. It is unnecessary to determine exactly what were the rights of the several parties; clearly Samuel had a substantial interest in the contracts, and a strong claim to the entire interest subject only to a lien for Harry and Rose's contributions. That they disputed the claim is unimportant. The compromise of a disputed claim is a good consideration. Second National Bank v. Curie, 116 N.J. Eq. 101 (1934).
The practical side of the matter cannot be ignored. The nominal purchase price of the hotel was $42,000; but the actual price was about $18,000. The value of the hotel is not stated. We know, however, it contained 80 guest rooms. The settlement of the controversy that the brothers agreed upon was not unfavorable to the defendants. Rose acquired title while Samuel and Lilly received a mortgage for their investment and a promise of one-fourth of the profits (if any) on a resale whenever Rose and Harry should decide to sell. Although the compromise included Samuel's agreement to *309 advance an additional $5,000, and to accept a mortgage for his entire advance, the transaction was not usurious, for the compromise that was the consideration for the 25% contract included a surrender by Samuel of his claim to title that I have already discussed. To constitute usury there must be an unlawful or corrupt intent, an intent to do what the law prohibits, namely, to take for the loan or forbearance of money something in addition to the six per cent per annum that the statute allows. Hoyt v. Bridgewater Copper Mining Co., 6 N.J. Eq. 253, 274; affirmed, Id. 625 (1848); Gillette v. Ballard, 25 N.J. Eq. 491; affirmed, 27 Id. 489 (1875); Norton v. Nathanson, 85 N.J. Eq. 409 (Backes, V.C., 1916). No such unlawful intent has been proved. The defense of usury fails and judgment must be awarded to the plaintiff on the contract.
The defendants Rose Altman and Harry, her husband, conveyed the hotel to Hotel Altman, a corporation, by deed dated May 13, 1940, only ten weeks after Rose had taken title. The Hotel Altman deeded the property to Friedman & Weiss, Inc., January 16, 1948. The defendants contend that the profits for which they are liable should be measured by the sale to the Hotel Altman, while the plaintiff urges that the critical sale  and the only real sale  was that to Friedman & Weiss.
Harry Altman procured the Hotel Altman to be incorporated April 10, 1939, with an authorized capitalization of 100 shares of no par value. The certificate of incorporation shows that 28 shares were subscribed for by Isabelle Altman and one share each by Herman and Sidney Rosenberg. Five days later  April 15th  Harry and Rose transferred to Isabelle a considerable amount of hotel furniture and equipment which, according to Harry, had been used in another hotel which they had formerly operated. He testified that the chattels were worth $9,000 more or less; that he and Rose made a gift of them to Isabelle, receiving no consideration, and that Isabelle turned them over to the Hotel Altman in satisfaction of her subscription for 28 shares. Isabelle at this time was *310 a few months less than 22 years old. In answer to interrogatories, Rose and Harry said that the consideration for their conveyance of the hotel property to the Hotel Altman was two shares of the stock of that corporation. The two shares would be worth $650, if Isabelle's 28 shares were worth $9,000. Seemingly, the two Rosenbergs were dummy incorporators and assigned their subscription to the defendants who made the conveyance in payment of the subscription. After the conveyance, Harry remained in control; his wife was president, and his daughter secretary, and he managed the hotel. In 1948, the Hotel Altman sold the hotel for $75,000, Rose and Isabelle signing the deed. The defendants admit that $12,745 of the consideration was "utilized for the benefit of the defendant Harry Altman."
It is entirely clear that there was no sale of the property by the defendants to the Hotel Altman; there was a mere transfer of the legal title for their convenience and benefit. The defendants must account for one-quarter of the profits upon the sale to Friedman & Weiss, Inc. If the parties cannot agree upon the figures, there must be a reference to a Master. Counsel for plaintiff will promptly prepare a judgment, interlocutory or final, submit it to his adversary for criticism, and then present it to me.