Paul S. DOPP, Plaintiff,

v.

Bob YARI, Defendant.

Civil No. 96–1242.

United States District Court,
D. New Jersey.

May 31, 1996.

St. John & Wayne by Donna duBeth Gardner, Newark, NJ, for Plaintiff.

McCarter & English by Joseph E. Lubertazzi, Jr., Nancy A. Washington, Ian S. Marx, Newark, NJ, for Defendant.

## OPINION

CLARKSON S. FISHER, District Judge.

This consolidated action involves the question of the enforceability of a contract for the financing of litigation in exchange for a divi-

sion of the final proceeds.[1] The underlying litigation has now been completed, and the parties have both filed suit seeking to litigate the enforceability of the agreement, which both parties agree calls for Paul S. Dopp ("Dopp") to pay Bob Yari ("Yari") $1.5 million. The matter comes before the court on Yari's motion for summary judgment entering judgment on the first count of Yari's complaint for breach of contract in this consolidated matter. Also before the court is Dopp's cross-motion for summary judgment. Because this court finds no genuine issues of material fact and concludes that the agreement is an enforceable contract, Yari's motion will be granted, Dopp's motion will be denied and judgment will be entered in favor of Yari in the amount of $1.5 million.

This matter involves what may be the final battle in a case that has taken on a life of its own. See *Dopp v. HTP Corp.*, 755 F.Supp. 491 (D.P.R.1991) (Dopp I); *Dopp v. HTP Corp.*, 947 F.2d 506 (1st Cir.1991) (Dopp II); *Dopp v. HTP Corp.*, 831 F.Supp. 939 (D.P.R. 1993) (Dopp III); *Dopp v. Pritzker*, 38 F.3d 1239 (1st Cir.1994) (Dopp IV) *cert. denied,* — U.S. —, 115 S.Ct. 1959 (1995); *Pritzker v. Yari*, 42 F.3d 53 (1st Cir.1994) (Dopp V) *cert. denied,* — U.S. —, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995); *Dopp v. Pritzker*, 68 F.3d 455 (Table), 1995 WL 628569 (1st Cir.1995). In recognition of this history, this court will provide a brief factual summary.

The present matter involves the third financing agreement between the parties and the second of two financing agreements between Yari and Dopp in which Yari purchased a stake in the outcome of civil litigation between Dopp and Jay A. Pritzker in exchange for providing Dopp with necessary financing of that litigation as well as maintaining Dopp's lifestyle. As will be discussed, the underlying litigation has now been completed, and Yari seeks to enforce the terms of the third and final litigation agreement.

The underlying litigation between Dopp and Pritzker stemmed from an oral contract between Dopp and Pritzker concerning the purchase of the Dorado Beach Hotel Corporation ("DBHC"), a company that controlled a complex of hotels and golf courses along the north shore of Puerto Rico. According to the parties, in 1984 Dopp obtained an option to purchase the DBHC but lacked the necessary financing. Dopp and Pritzker subsequently entered into an oral agreement in which Pritzker would provide the necessary financing and Dopp would receive a portion of corporate shares of a company formed for the purpose of acquiring DBHC. The basis of the case against Pritzker was the allegation that Pritzker had employed duress and deceit to pressure Dopp into signing documents which amended the oral agreement and granted Pritzker an option to retire Dopp's interest, which Pritzker subsequently executed.

In 1988, Dopp initiated a diversity suit against Pritzker in the United States District Court for the District of Puerto Rico alleging deceit and duress and seeking damages or reformation. In 1990 the case was tried and the jury found Pritzker liable in the amount of $2,000,000. *Dopp v. HTP Corp.*, 755 F.Supp. 491, 493 (D.P.R.1991). Ten appeals followed. On October 4, 1991, the First Circuit affirmed the finding of liability against Pritzker but remanded to the district court for a new trial on the issues of remedies and damages.

Faced with the costs of a second trial on the issue of damages and other related living costs, Dopp and Yari entered into an agreement in which Yari agreed to provide Dopp with necessary funding in exchange for a division of any final judgment against Pritzker. The agreement provides in relevant part:

> 5–Any monetary proceeds from any final Judgment of the Court with respect to the Action (the "Judgment") after deduction of any sums due Ledesma, Palou & Miranda

---

1. At English common law, agreements to finance litigation in exchange for a division of the proceeds, arising out of the doctrine of champerty, were unenforceable as agreements tending to induce or promote needless litigation. But it was held in New Jersey's former Supreme Court that the law of maintenance and champerty has never prevailed in this state. *Schomp v. Schenck,* 40 N.J.L. 195 (Sup.Ct.1878).

("Counsel") ... shall be distributed between Yari and Dopp as follows:

(i) First to repayment of all indebtedness to the Bank in relation to the Line of Credit ...

(ii) Secondly, the sum of $2,500,000 (or $3,000,000 if the Line of Credit is extended to $3,000,000) to Yari (or any fraction of that amount if the Proceeds will not cover the full amount),

(iii) Thirdly, the sum of $12,000,000 to Dopp,

(iv) Fourthly, the sum of $7,000,000 to Yari,

(v) and any remaining shall be equally divided between Dopp and Yari.

Affidavit of Yari, Ex. A.

Although the First Circuit has upheld liability at the time of the agreement, the agreement acknowledges that "the [underlying] action entails a degree of risk and that there may be no Proceeds to disburse." *Id.*

On March 27, 1993, a second jury returned a verdict for full damages against Pritzker in the amount of $17,000,000. To the surprise of Yari, Article 1425 of the Civil Code of Puerto Rico confers on a defendant the right to redeem the interest a third party has in the judgment in exchange for the amount the third party paid to purchase the share, along with the judicial costs and interest at the rate of 6%. P.R.Laws Ann., title 31, § 3950. The purpose of this statute is to prevent the precise form of speculation in litigation that occurred in this case. *Pritzker v. Yari,* 42 F.3d 53, 66 (1st Cir.1994). As of March 27, 1993, Yari had provided Dopp financing in the amount of $450,000.00.

Upon learning of this statutory right, Pritzker filed suit against Yari in the United States District Court for the District of Puerto Rico seeking, *inter alia,* to extinguish Yari's portion of the proceeds. By opinion and order dated March 5, 1993, and opinion and order dated September 9, 1993, the district court granted Pritzker's motions and entered an order granting Pritzker the opportunity to extinguish Yari's share in the Dopp litigation and reduce the total judgment by $3,503,767.29 in exchange for tendering Yari $450,000.00 plus interest and costs. In computing the amount of credit, the district court limited the amount of the final judgment Pritzker could reduce by half. The court made this adjustment on the basis that it was inequitable to punish Dopp under the circumstances. Two appeals followed.

In the first appeal, Dopp suggested, *inter alia,* full damages properly computed totaled $60,581,000; Pritzker suggested $35,000. *Dopp v. Pritzker,* 38 F.3d 1239 (1st Cir.1994) *cert. denied,* —— U.S. ——, 115 S.Ct. 1959 (1995). In the second appeal, Yari challenged, *inter alia,* the application of § 1425 of the Civil Code and Pritzker challenged the district court's authority to limit the amount by which the final judgment could be reduced. *Pritzker v. Yari,* 42 F.3d 53 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995).

While the two cases were on appeal, the second and third financing agreements originated. First, on April 7, 1993, Yari provided Dopp an additional $50,000. Then, on June 21, 1993, Yari wired Dopp an additional $25,000.00 along with correspondence detailing the parties' arrangement. The letter provides in relevant part:

Pursuant to your request, I am wiring today an additional $25,000.00 to your account. I am writing this letter to gain your consent to the following: *Provided* our agreement of July 23, 1992 is *finally* transferred to Pritzker pursuant to the District Court's ruling under Article 1425, in which event, *and only in such event,* this and any future payment would *not* fall under our agreement as continued funding pursuant to the September 24, 1992 amendment, then, *and only then,* you agree to repay this and any future payments you receive from me hereafter upon your receipt of any proceeds from your underlying litigation with Pritzker including interest at a rate of 9% per annum.

Affidavit of Yari, Ex. J. (emphasis in original).

On October 28, 1994, the First Circuit issued its opinion in *Dopp v. Pritzker,* 38 F.3d 1239 (1st Cir.1994) (Dopp IV), *cert. denied,* —— U.S. ——, 115 S.Ct. 1959 (1995), and concluded that a remitter in the amount

of $2,828,038.00 was appropriate. The court remanded to the district court with instructions for Dopp to consent to an award of full damages of $14,171,962, or for the district court to order a new trial on full damages. *Id.* at 1251. By that time, Yari had provided Dopp over $700,000 in financing, $450,000 of which was the subject of the appeal by Yari, and an additional $250,000 in the subsequent funding.[2]

Following the issuance of the First Circuit opinion, Dopp sent to Yari an "Irrevocable Offer To Settle" dated November 7, 1994. The offer provides in relevant part:

> You are finding it difficult to understand that my complete focus, since October 28th, has been upon First Circuit's biased and unexpected decision. In the interest of setting your mind at rest over our agreement, and keeping in mind your reluctance to execute, now, my earlier offers to document our July 18th understanding, I offer the following:

> In consideration of your past continued funding (now $700,000 & not inclusive of the Piper Project $10,000 & The SANWA BANK $50,000 Mtge accommodation), I will offer, irrevocably until ten days following the entry of a final judgment in all Pritzker litigation, to pay you 16% percent of all proceeds (after deducting only LP & M's share) against a minimum of $1.5 million. In addition, I will agree to repay the $700,000 with your ¾ share representing consideration for such $700,000 funding. (The Piper due diligence expenses, for which I have now disbursed in excess of $30,000, and the SANWA BANK $50,000 are the subject of separate agreements).

> Naturally, a detailed document reflecting the Irrevocable Offer To Settle, I am certain, will be required. This, however, is, and does, put at rest your unwarranted concerns over our July 18th agreement and permits me to fully concentrate on the urgent work at hand. Please have Roger (or whomever you prefer) prepare the appropriate documentation for this Agreement, which clearly confirms your rights

and will not require notice to any other party.

Affidavit of Yari, Ex. K.

> On November 7, 1994, Yari wrote to Dopp. Thank you [for your] Irrevocable Offer contained in your letter dated November 7, 1994. I understand the offer as irrevocable on your part as its stands and so I do not believe any further documentation is necessary until and unless I accept the offer with the time limits set forth therein. In addition to the consideration recited in your letter, it is our understanding that, as present consideration, I am directing my attorney, Roger Crane, at your request, to assist your attorney, Ruben Nigaglione, in preparing a Motion for Rehearing. I shall bear the costs of my attorney's efforts.

Id. at Ex. L.

On December 13, 1994, the First Circuit issued its opinion in *Pritzker v. Yari,* 42 F.3d 53 (1st Cir.1994) (Dopp V), and upheld the ability of Pritzker to extinguish Yari's litigation share but reversed the district court's equitable decision to limit the amount Pritzker could extinguish.

On December 16, 1994, Yari wrote to Dopp and accepted the "Irrevocable Offer To Settle." Affidavit of Yari, Ex. M. At no time did Dopp suggest a more detailed agreement was necessary. Following the acceptance, Yari wired Dopp an additional $230,000 in ten payments between January 12, 1995 and July 10, 1995. Id. at Ex. N.

Additionally, a petition for rehearing *en banc* was denied in Dopp IV, petitions for certiorari were denied by the United States Supreme Court in both Dopp IV and Dopp V, and Dopp subsequently filed an unsuccessful appeal to the First Circuit following the district court's decision after remand of Dopp IV. *See Dopp v. Pritzker* (Dopp VI), 68 F.3d 455 (Table), 1995 WL 628569, *4 (1st Cir. 1995).

Finally, on January 8, 1996, the District Court for the District of Puerto Rico entered final judgment against Pritzker and in favor of Dopp and ordered Pritzker to pay Dopp $9,989,606.94 plus interest. Dopp received

---

**2.** Exhibit N suggests a total of $785,000 had been wired from Yari to Dopp as of November 30, 1994. Of this amount approximately $60,000 involved unrelated matters.

approximately $5.3 million of that amount in January and February of this year. An additional $1.99 million remains on deposit with the District Court of Puerto Rico awaiting a ruling from the Puerto Rico Department of Revenue on whether that sum is subject to tax. Of the $5.3 million received, Dopp retired approximately $2.7 million in debt including $530,000.00 [3] borrowed from Yari.

After the Final Judgment was paid, both parties filed complaints in this court premising jurisdiction on diversity of citizenship. 28 U.S.C. § 1332. Dopp is a New Jersey resident, Yari a California resident. By order dated April 17, 1996, the matters were consolidated. Yari's six-count complaint sounds in breach of contract, unjust enrichment, constructive trust and equitable lien and seeks $1.5 million pursuant to the November 7, 1994, offer. Dopp's complaint seeks a declaratory judgment declaring that the November 7, 1994, offer and the subsequent acceptance are null and void.

In a previous opinion entered April 1, 1996, this court denied Yari's application to freeze the assets of Dopp pending final determination of the case. In that opinion this court concluded that the proofs submitted by Yari which alleged that Dopp was seeking to evade creditors were insufficient as a matter of law to justify freezing Dopp's assets.

The matter now returns to the court on Yari's motion for summary judgment. In opposition to entry of judgment and in support of cross-motion, Dopp has suggested the contract in question violates New Jersey's criminal usury statute and is therefore unenforceable. N.J.S.A. 2C:21–19. Additionally, Dopp argues that no enforceable contract exists. In support Dopp suggests the agreement lacks consideration, is missing material terms, was not accepted and was offered to Yari only under duress. Finally, Dopp suggests that summary judgment is inappropriate without the opportunity to conduct discovery. Because the court finds these arguments without support and because the court finds that no genuine issues of material fact exist, summary judgment

will be entered on Count I of the complaint, and judgment will be entered in favor of Yari in the amount of $1.5 million.

## I. DISCUSSION

■ As an initial matter this court must address what substantive law applies. A federal district court sitting in diversity must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New Jersey choice-of-law rules in contract cases, in the absence of an effective choice of law by the parties, New Jersey courts have attempted to apply the law of the jurisdiction "having the most significant relationship to the parties and to the transaction." *Caribe Hilton Hotel v. Toland,* 63 N.J. 301, 307 A.2d 85 (1973). See Restatement (Second) of Conflict of Laws, § 188 (1971).

■ In the instant case, negotiations took place via fax and telephone between Dopp's residence in New Jersey and Yari's residence in California. At oral argument, both parties agreed New Jersey law should apply to determine whether a contract exists and whether that contract is usurious. Additionally, New Jersey has a specific interest in protecting its residents from out-of-state lenders who seek to lend money to New Jersey residents on terms which are usurious under New Jersey law. *Oxford Consumer Discount Co. of No. Phila. v. Stefanelli,* 102 N.J.Super. 549, 246 A.2d 460 (App.Div.1968), *mod.* 104 N.J.Super. 512, 250 A.2d 593 (App. Div.1969), *mod.* 55 N.J. 489, 262 A.2d 874 (1970), *app. dismissed,* 400 U.S. 808, 91 S.Ct. 45, 27 L.Ed.2d 38 (1970).

In *Oxford Consumer Discount Co.,* the New Jersey Superior Court, Appellate Division, concluded that the legislative history of the New Jersey Secondary Loan Mortgage Act of 1965, N.J.S.A. 17:11 A–1, demonstrated a legislative intent that the Act govern the terms of any secondary mortgages made to a New Jersey resident involving New Jersey realty notwithstanding the execution of the

---

**3.** An additional $450,000 was paid by Pritzker to extinguish Yari's litigation credits under the July 23, 1992 agreement.

loan documents outside of the state and in favor of a foreign corporation. *But see Oxford Consumer Discount Co. of No. Phila. v. Stefanelli*, 55 N.J. 489, 499–500, 262 A.2d 874 (1970) (Weintraub, J., dissenting), *app. dismissed*, 400 U.S. 808, 91 S.Ct. 45, 27 L.Ed.2d 38 (1970).

More recently, in *Turner v. Aldens, Inc.*, 179 N.J.Super. 596, 601, 433 A.2d 439 (App. Div.1981), the New Jersey Superior Court, Appellate Division, concluded that the interest rate provisions contained in the Retail Installment Sales Act, N.J.S.A. 17:16C–1, were intended to protect New Jersey consumers no matter from where the seller deals and despite the "election" of the parties in the contract of adhesion that Illinois law would apply. In reaching this conclusion, the court noted, the evil sought to be remedied by N.J.S.A. 17:16C–1, is the charging of excessive interest to New Jersey consumers. The court concluded:

> "[t]hat evil is of such a nature that we are confident the Legislature did not intend to discriminate on the basis of the source of supply. Rather, it endeavored to protect residents of this State from the evil irrespective of whether its source was in-state or out-of-state."

*Id.* at 602, 433 A.2d 439.

While neither of those cases dealt with the precise statute at issue in this case, the opinions are persuasive. As a federal district court sitting in diversity, this court is asked to determine whether the New Jersey Supreme Court would apply New Jersey's own criminal usury statutes to a suit brought against a New Jersey resident to enforce a contract. In light of these cases and the stipulation of the parties, this court concludes that this court should examine the transaction pursuant to New Jersey substantive law.

Turning to the merits of the case, the entry of summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The burden of establishing the absence of a genuine issue is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this burden is met, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. An issue is "genuine" "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In the instant matter I find no genuine issue of material fact exists that Dopp made a valid offer and that offer was accepted by Yari. The November 7, 1994, letter provided all the necessary terms of the offer. Those terms were accepted by Yari. Dopp's suggestion that Yari's offer to provide the services of his attorney as additional consideration amounted to a counteroffer is meritless. Additionally, Dopp's argument that the documents demonstrate only preliminary negotiations, not an agreement, is unpersuasive. As explained by the New Jersey Superior Court, Appellate Division:

> the fact that parties who are in agreement upon all necessary terms may contemplate that a formal agreement yet to be prepared will contain such additional terms as are later agreed upon will not affect the subsistence of the contract as to those terms already unqualifiedly agreed to and intended to be binding. 1 *Corbin on Contracts* (1950).

*Comerata v. Chaumont, Inc.*, 52 N.J.Super. 299, 305, 145 A.2d 471 (App.Div.1958).

Additionally, Dopp's suggestion that the agreement lacked consideration suffers from the same deficiency. At the time of the offer, the issue of whether Pritzker could extinguish Yari's share of the litigation resulting from the July 23, 1992, agreement was pending before the First Circuit, and both parties agree that if the First Circuit reversed in Dopp V, Yari stood to gain a far greater portion of any judgment against Pritzker. Additionally, Yari had a right to receive 9% interest on the second agreement.

Thus, conceivably, Yari stood to gain a substantial portion of the judgment plus interest on the second agreement if Dopp V was decided in his favor.

Additionally, Dopp wanted additional funding from Yari. The third agreement settled the issue and offered a 16% share in the litigation subject to a minimum of $1.5 million of the net proceeds of the litigation in exchange for your "past continued funding (now $700,000. . . ." Affidavit of Yari, Ex. K. Following the offer Yari provided Dopp an additional $20,000.00 in late November, and following acceptance of the offer Yari provided Dopp an additional $230,000.00 in financing. Id. at Ex. N. Thus, the third financing agreement was a bargained-for exchange. *Continental Bank of Pa. v. Barclay Riding Acad.*, 93 N.J. 153, 170, 459 A.2d 1163 (1983), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 684 (1983).

Additionally, Dopp suggests that summary judgment is inappropriate because he was under "great duress" at the time when he made the offer and that therefore the offer is invalid. Dopp suggests that at the time of the offer he was in need of additional financing, which he suggests Yari was improperly withholding, and he was under the belief that the First Circuit would reverse in Dopp V. Dopp suggests that in such cases summary judgment is inappropriate without further discovery and that a jury trial is required.

Dopp relies upon *Shanley & Fisher, P.C. v. Sisselman*, 215 N.J.Super. 200, 212, 521 A.2d 872 (App.Div.1987), in which the New Jersey Superior Court, Appellate Division commented, "when there has been moral compulsion sufficient to overcome the will of a person otherwise competent to contract, any agreement made under the circumstances is considered to be lacking in voluntary consent and therefore invalid." In *Shanley & Fisher* the Appellate Division concluded it was reversible error for the trial court to grant summary judgment in the face of the defendant's duress and undue-influence claim. Dopp suggests that the case precludes summary judgment in the instant matter.

The court disagrees. Summary judgment is appropriate only if there is no "genuine issue" of any material fact and the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the instant matter, Dopp supplies only an affidavit that he was under "great duress." No genuine issue of material fact is created by this submission. Moreover, Dopp has set forth no facts which justify the need for further discovery. Fed.R.Civ.P. 56(f).

■ Finally, Dopp argues that the agreement in question is not an agreement establishing the division of proceeds from a joint undertaking but, rather, a usurious loan in excess of the legal limit. Under New Jersey law, usury is the exaction of a rate in excess of the amount permitted by law. *Ferdon v. Zarriello Bros. Inc.*, 87 N.J.Super. 124, 208 A.2d 186 (L.Div.1965). In New Jersey, loans in excess of $50,000 are governed by the criminal usury statute. N.J.S.A. 2C:21-19. The applicable rate of 30% per annum is the maximum legal rate.[4] The civil remedy for a usurious loan is to sever the interest portion of the loan and permit recovery only of the principal. *Schuran, Inc. v. Walnut Hill Associates*, 256 N.J.Super 228, 233, 606 A.2d 885 (L.Div.1991).

■ Generally, in order to prove usury, a party must establish three elements: (1) a loan of money, (2) an absolute obligation to repay the principal and (3) the exaction of a greater compensation than that allowed by law for the use of the money. The burden of proof on a party claiming a corrupt bargain is upon the one who asserts a claim of usury. *Ditmars v. Camden Trust Co.*, 10 N.J. 471, 498, 92 A.2d 12 (1952). Additionally, it is not enough that the circumstances established render it probable that there was a corrupt

---

**4.** The statute provides in part:
  a. Criminal Usury. A person is guilty of criminal usury when not being authorized or permitted by law to do so, he:
  (1) Loans or agrees to loan, directly or indirectly, any money or other property . . . with an interest rate which exceeds 30% per annum shall not be a rate authorized or permitted by law . . .
  N.J.S.A. 2C:21-19.

bargain. *Altman v. Altman,* 8 N.J.Super. 301, 307, 72 A.2d 536 (Ch.1950). The defense of usury fails unless it is clearly established by a preponderance of the evidence. *Id.* It is also the general rule that when the terms of the agreement are subject to two constructions, one of which will render it lawful and one of which will render it usurious, in the absence of evidence requiring the contract to be construed as usurious, courts will give the contract a construction that will render the agreement lawful. *Lindsey v. Campbell,* 132 Cal.App.2d 746, 282 P.2d 948 (Cal.App.1955); *Fried v. Bolanos,* 187 A.D.2d 108, 110, 592 N.Y.S.2d 144, 146 (N.Y.App.Div.1993).

In this case Dopp suggests the transaction is usurious because Yari was promised payment of $1.5 million plus the return of his $700,000, in exchange for the loan of $700,000. In response, Yari argues that in order to find usury, there must be the existence of a loan and the exaction of unlawful interest. Yari notes that "[i]n order to constitute a loan, there must be a contract whereby, in substance, one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use." PI. Br. at 19 (quoting 47 C.J.S. *Interest and Usury; Consumer Credit* § 123 (1982)).

Yari suggests that in the instant case the agreement was not a loan but, rather, a joint investment, because if there had been no recovery in the Pritzker litigation, he would not have recovered the principal. Yari suggests that when a return of money is contingent on the happening of an event, the transaction is not a loan and therefore cannot be usurious. *Altman v. Altman,* 8 N.J.Super. 301, 307, 72 A.2d 536 (Ch.1950). Additionally, Yari argues that even assuming there was an obligation to return the $700,000 principal, the $1.5 million was not guaranteed interest but a contingent share of the profits. Yari argues that because there was no guaranteed interest, but rather a contract for the division of the litigation proceeds, the transaction was not a loan but, rather, a joint undertaking, not subject to the usury law.

In support, Yari points to the initial July 1992 agreement between the parties, which clearly contemplated a division of the litigation proceeds, if any. Yari suggests that the November 7, 1994, offer must be interpreted in light of the original agreement and the subsequent correspondence between the parties. Additionally, Yari notes that the June 21, 1993, agreement provides, "... you agree to repay this and any future payments you receive from me hereafter *upon your receipts of any proceeds* from your underlying litigation with Pritzker including interest at a rate of 9% per annum." Id. at Ex. J. (emphasis added). Yari suggests that throughout the case, proceeds, if any, were an uncertainty and that he was never guaranteed an unconditional return of $1.5 million. Finally, Yari points to the November 7, 1994, offer, which provides:

> ... I will offer, irrevocable until ten days following the entry of a final judgment in all Pritzker litigation, *to pay you 16% of all proceeds (after deducting only LP & M's share) against a minimum of $1.5 million.*

Id. at Exhibit K. (emphasis added).

Yari suggests that the document clearly contemplates a division of proceeds, with payment depending upon receipt of the proceeds. In response, Dopp argues that, assuming that payment of the $1.5 million was contingent, and accepting Yari's argument that it was, the contract is usurious as a matter of law if there is any contingency by which the lender may receive more than the lawful rate of interest. Dopp Br. at 11. Dopp relies upon *Najarro v. SASI Intern., Ltd.,* 904 F.2d 1002, 1010 (5th Cir.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991).

In *Najarro,* the Fifth Circuit addressed whether transactions which imposed on the borrower the obligation to return the principal along with a "commission" equal to a 25% annualized rate of return on the principal were usurious under Texas law. The district court had rejected the defendant's claim of usury and enforced the agreement finding no loan and, alternatively, no scheme to charge usury. In concluding that no loan had occurred, the district court had relied upon affidavits previously filed by the defendants in moving to dismiss for lack of subject-

matter jurisdiction, where the defendants took the position that the agreement was never "intended to be anything other than investment. There was never intended to be a loan." *Id.* at 1006.

On appeal the Fifth Circuit reversed, concluding that the affidavits of the parties did not create any relevant summary judgment issues on whether a loan existed. Instead, the court noted that the question is whether money is advanced with an absolute obligation to repay. The court found both of these elements were present and therefore summary judgment was inappropriate.

Having satisfied the first two elements of usury, the court turned to the issue of whether the loans charged an interest rate greater than that permitted by law. Plaintiff, similar to Yari in this case, argued that because the payment of the 25% commission was contingent on defendant's earning a profit, the interest rate was contingent and should not constitute usurious interest. In support, plaintiff relied upon a line of cases for the proposition that when interest depends upon a contingency, the loan is not usurious. The court, however, concluded that more recent Texas cases had adopted the contrary rule that "[a] contract is usurious if there is any mode or contingency by which the lender could receive more than the maximum rate of interest allowed by law." *Id.* at 1010 (quoting *Dixon v. Brooks,* 678 S.W.2d 728, 729 (Tex.Ct.App.1984)). The court concluded that because the plaintiff had not presented evidence that the agreement to pay commissions "was unenforceable by plaintiffs under *all* circumstances," the contract was usurious as a matter of law. *Id.* (emphasis in original).

Dopp suggests that rule of law in *Najarro* is applicable to the instant matter because regardless of whether payment was contingent on receipt of proceeds, a contingent interest is usurious as a matter of law. The court disagrees. Recently the Texas Court of Appeals declined to apply *Najarro,* limiting the case to the proposition that a loan is usurious only if the amount of interest the borrower would be obligated to pay is set forth in the contract and would be unconditionally payable if the contingency occurred.

*First USA Management, Inc. v. Esmond,* 911 S.W.2d 100, 106 (Tex.Civ.App.1995). Moreover, the rule of the law in Texas according to the Fifth Circuit is at odds with the law of the majority of jurisdictions, and this court concludes New Jersey would not follow the Texas rule.

Rather, the rule adopted by the majority of jurisdictions, including New York and California, permits collection of interest rates in excess of the legal rate when the collection of the entire interest is at risk and depends upon a contingency and provided that the parties contracted in good faith without the intent to evade the usury laws. *Arneill Ranch v. Petit,* 64 Cal.App.3d 277, 134 Cal. Rptr. 456, 461–464 (Cal.Ct.App.1976); *Fried v. Bolanos,* 217 A.D.2d 823, 629 N.Y.S.2d 538, 539–540 (1995). This rule is set forth with approval in Restatement (First) of Contracts, § 527 (1932); 14 Williston on Contracts 1692 (3d ed. 1972), § 1692; 47 C.J.S. § 141. As explained in Williston:

> It was stated in an early case that if the interest only was put at hazard, the transaction would be usurious, and it is clear that where the interest only is subjected to a contingency there is greater opportunity for colorable transactions. If, however, the transaction is a genuine business venture it is not usurious, according to the better view, to provide for payment on a contingency of interest exceeding the legal rate, although the principal may be absolutely repayable.
>
> Such arrangements, however, will not be upheld in any case where the purpose is to evade the statutes against usury, no matter what form the transaction may take.

14 Williston on Contracts 1692 (3d ed. 1972).

Because the New Jersey Supreme Court has not ruled on the issue, this court, a federal district court sitting in diversity, must predict how the New Jersey Supreme Court would rule if presented with the facts of this case. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). In making this determination this court may look to the state's lower-court decisions as well as the opinions of other jurisdiction. Although no case in New Jersey is on point, in several cases New Jersey

has adopted similar positions consistent with the majority view.

For example in *Loigman v. Keim*, 250 N.J.Super. 434, 437, 594 A.2d 1364 (Law.Div. 1991), the New Jersey Superior Court, Law Division, concluded that the usury laws of New Jersey do not apply to contingent interest charges on a defaulted obligation when the intent of the parties is for the debtor not to default.

The *Loigman* court noted that the courts of New Jersey had not addressed this issue since 1877, when the New Jersey Supreme Court decided the case of *Ramsey v. Morrison*, 39 N.J.L. 591 (Sup.Ct.1877). In *Ramsey* defendant borrowed on a one-month note which required defendant to pay interest and post as collateral 25 shares of stock. The agreement provided that if the note was not paid in one month, the collateral would be forfeited without any offset of the principal. The Supreme Court in *Ramsey* concluded the agreement was not usurious, holding:

> It is essential to the nature of usury that a certain gain, exceeding the legal rate of interest, is to accrue to the lender as a consideration for the loan. If the gain to the lender, beyond the rate of interest, is by the contract, made dependent on the will of the borrower, as where he may discharge himself from it by punctual payment of the principal, the contract is not usurious.

*Loigman v. Keim*, 250 N.J.Super. 434, 594 A.2d 1364 (Law.Div.1991) (quoting *Ramsey v. Morrison*, 39 N.J.L. 591, 593 (Sup.Ct.1877)).

The court in *Loigman* concluded that the majority view and the opinion set forth in *Ramsey* appears to be that provisions for interest that are dependent upon some default of the buyer before they become operative are not subject to usury. *Id.* at 437 (citing *Klapper v. Integrated Agr. Mgt. Co.*, 149 A.D.2d 765, 539 N.Y.S.2d 812 (1989)). This rule of law is set forth in 47 C.J.S. § 140.

■ Consistent with those cases, this court concludes that New Jersey would adopt the better view according to Williston, that the collection of interest in excess of the lawful rate is not usurious if collection of the entire interest is at risk and depends upon a contingent event and provided and the contract was entered into in good faith and without the intent to evade the usury laws. 14 Williston on Contracts 1692 (3d ed. 1972). In the instant case, the burden is on Dopp to establish a genuine issue of material fact of whether the agreement in question was a usurious loan. *Altman v. Altman*, 8 N.J.Super. 301, 307, 72 A.2d 536 (Ch.1950). That burden has not been met. This court finds the agreement can clearly be construed as a joint undertaking of the parties disclosing an intent to distribute proceeds of the case, if any.

In light of this construction and the absence of any dispute that the parties entered the transaction in good faith without the intent to evade the usury law, summary judgment is appropriate. Accordingly, this court concludes that the New Jersey criminal usury statute has no application.

Finally, this case is similar to the recent case of *Kraft v. Mason*, 668 So.2d 679 (Fla. Dist.Ct.App.1996), in which the District Court of Appeal of Florida upheld an action by a plaintiff to enforce a contract to share in the division of the proceeds of litigation in exchange for providing a necessary $100,000 in funding for the litigation. After the underlying litigation settled for $5,015,000, the plaintiff brought suit to collect on her portion of the proceeds. After a nonjury trial, the trial court entered final judgment on behalf of the plaintiff and rejected all defenses. On appeal the court affirmed the trial court's determination that the transaction was not usurious on the basis that plaintiff lacked the requisite corrupt intent to collect a usurious rate. Additionally, the court noted that the profit or interest was contingent and, thus, the transaction could not constitute usury. The court concluded:

> Yet another reason the loan was not usurious is that the money to be paid Mason could be characterized as a bonus to be received for participating in an uncertain transaction. A loan agreement is not usurious when payment depends upon a contingency. Here, when the loan was given, any talk of recovery was pure speculation. Quite possibly, there would be no success-

ful recovery from the antitrust litigation, and Mason might have collected nothing beyond the pay back of the loan. The contingent nature of any "interest" to Mason makes the agreement non-usurious.

*Id.* at 684 (citations omitted).

The discussion of the court in Kraft is persuasive. This case is about enforcing agreements. Dopp has already received the entire benefit of the agreement without the burden of performance. Today Dopp seeks to evade his obligation.

This court's obligation is to enforce bargains unless those bargains violate statute or public policy. This court concludes that the instant transaction does not violate the New Jersey criminal usury statute and is enforceable. N.J.S.A. 2C:21–19. As discussed above, the transaction had all the markings of a joint undertaking and not a loan which called for the unconditional return of principal plus an unlawful interest rate. Notably absent is any mention in the document of the time of maturity or the interest rate applicable, two marks of traditional note. Additionally, even if the transaction is viewed as a loan and the court concluded that the internal rate of return amounted to interest, the "interest" if any was contingent and, accordingly, nonusurious.

Finally, this court sees nothing immoral or contrary to public policy in enforcing an agreement entered into by Dopp and compensating Yari for the risk undertaken. Accordingly, summary judgment will be granted and judgment entered in the amount of $1.5 million with prejudgment interest in favor of Yari and against Dopp.