OXFORD CONSUMER DISCOUNT COMPANY OF NORTH PHILADELPHIA, A CORPORATION, PLAINTIFF-APPELLANT, v. ANTHONY E. STEFANELLI AND THERESA A. STEFANELLI, DEFENDANTS-RESPONDENTS, AND ARTHUR J. SILLS, ATTORNEY GENERAL OF NEW JERSEY, INTERVENOR-RESPONDENT, AND FIRST MERCANTILE CONSUMER DISCOUNT COMPANY, INTERVENOR-APPELLANT, AND PAUL V. DURKIN AND ELLEN DURKIN, HIS WIFE, INTERVENORS-RESPONDENTS.

Argued January 6, 1970—Decided March 17, 1970.

*Mr. Morris L. Weisberg,* of the Pennsylvania Bar, argued the cause for plaintiff-appellant (*Messrs. Glickman & Valentine,* attorneys).

*Mr. Arnold K. Mytelka* argued the cause for intervenor-appellant (*Mr. Roger S. Clapp,* of counsel; *Messrs Clapp & Eisenberg,* attorneys).

*Mr. Steven S. Radin,* argued the cause for Middle Atlantic Finance Association, *amicus curiae* (*Mr. Michael B. Tischman* and *Mr. Alan J. Gutterman,* on the brief; *Messrs. Cummis, Kent & Radin,* attorneys).

*Mrs. Annamay T. Sheppard* argued the cause for defendants-respondents.

*Mr. Jack B. Kirsten* argued the cause for intervenors-respondents Paul V. Durkin and Ellen Durkin, his wife, (*Mr. Robert S. Solomon,* on the brief; *Messrs. Kirsten & Solomon,* attorneys).

*Mr. Stephen G. Weiss,* Assistant Attorney General, argued the cause for intervenor-respondent Arthur J. Sills, Attorney General of New Jersey (*Mr. Fred R. Gruen,* Deputy Attorney General, on the brief).

PER CURIAM. Subject to a qualification to be stated, the judgment of the Appellate Division is affirmed substantially for the reasons expressed below in the exhaustive opinions of Judge Conford. *Oxford Consumer Dis. Co. of No. Phila. v. Stefanelli,* 102 *N. J. Super.* 549 (App. Div. 1968), and 104 *N. J. Super.* 512 (App. Div. 1969).

The first opinion of the Appellate Division was handed down on September 11, 1968. Prior to that date certain New Jersey borrowers other than the defendants Stefanellis had brought suit against First Mercantile Discount Company and another Pennsylvania loan company in the Superior Court, Chancery Division, seeking an injunction to prevent the enforcement of all secondary mortgage loans made by such corporations on the security of New Jersey realty. Basically the same issues were involved in that action (which the

plaintiffs were allegedly prosecuting as a class action) as in the *Oxford* case. Subsequent to September 11, 1968 some of these parties applied to the Appellate Division for leave to intervene and for a rehearing in order to be heard on the issues decided in *Oxford*. The leave was granted and the common problems in the cases were reargued. One of the primary questions presented for further consideration was whether, if the Appellate Division adhered to the view expressed in the September 11, 1968 opinion respecting the applicability of the New Jersey Secondary Mortgage Loan Act, the judgment should be prospective or retrospective in scope. The position of the loan companies was that in no event should loan transactions made by Pennsylvania corporations licensed in Pennsylvania to make such loans and entered into before the effective date of that decision be adversely affected by it, where the loans were not only made in Pennsylvania but were repayable there and in all other respects were in conformity with Pennsylvania law. (See 104 *N. J. Super.*, at 516).

Thereafter the Appellate Division affirmed its original holding and dealt comprehensively with the prospectivity — retroactivity issue. 104 *N. J. Super.*, at 519–25. It held that sufficient equitable considerations were present to warrant denial of unrestricted retroactive operation of the September 11, 1968 decision. In specifying the restrictions it said:

1. "We have concluded that we should not now go beyond adjudicating relief from retroactivity in respect of transactions where there was no intermediation of any kind by others, operating in this State, between Pennsylvania lender and New Jersey borrower."

2. "We are clear, first, that Pennsylvania lenders obtaining New Jersey loan business on a regular continuing basis by or through agents, brokers, or representatives operating in this State, whether or not technically independent contractors, could not reasonably have been advised in advance that choice of law and interstate commerce factors would immunize the loans from the effect of the New Jersey act. As to such loans, therefore, the decision of September 11, 1968 will remain fully retroactive. As to any other type of case involving some degree of causal intermediation between the lender and the borrower by operatives functioning in this State, the court

should appraise the particular facts of the individual case for determination as to whether considerations of fairness and justice call for relief from retroactivity of the September 11, 1968 decision in such instance, according to the criteria discussed above."

3. "It is next necessary to decide whether there should be any curtailment of the lender's claim to interest and other charges where it ultimately qualifies otherwise for relief from retroactivity. As heretofore noted, plaintiff and intervenors contend that fairness would be served by requiring the borrowers to pay the interest rates and other charges (if specifically agreed to in the loan contract) allowed for such transactions by either the New Jersey or Pennsylvania statute whichever is the lower. We think some further curtailment of recoverable interest is appropriate in order to give a degree of substantial effect to the circumstance that, in finality, the lenders have violated New Jersey law as substantively determined by our prior decision. Therefore recovery will be limited to 6% per annum simple interest computed on principal balances outstanding on funds actually advanced." (Numbering of paragraphs ours.) 104 *N. J. Super.*, at 524–525.

We take paragraph 3 to mean that in *all* cases of loans made by plaintiffs as well as intervenor and *amici* loan companies to New Jersey borrowers and secured by secondary mortgages on New Jersey realty as defined in *N. J. S. A.* 17:11A–1a, which are not within the bar of paragraph 2 above, the lender may recover the sum of the loan as actually advanced but only with 6% simple interest on principal balances outstanding. In our view the equities referred to in the second Appellate Division opinion on the subject of retroactivity of the September 11, 1968 decision require a less drastic limitation.

Assuming the loan transactions by Anthony E. and Theresa A. Stefanelli, defendants in the principal case, and Paul V. Durkin and Ellen Durkin, Lindley Henry, Jr. and Irene Henry, Paul Kuzmick and Jane Kuzmick, plaintiffs in the injunction action referred to above, had been instituted and in existence prior to September 11, 1968 and are not within paragraphs 1 or 2 quoted above, these parties are entitled to retroactive benefit of the decision of that date to this extent: They shall be liable for the agreed installment payments of the principal of the actual loan to them but without interest. Additionally, if their loan transactions resulted from intermediation within the contemplation of paragraphs

1 or 2, the September 11, 1968 decision shall be fully retroactive, and they shall have no liability on their loans.

■ If there are other persons not named above who were, prior to September 11, actually in litigation challenging the validity of the type of loans that are involved in this case, they too are entitled to the benefit of the rules of retroactivity just described. Further, the September 11, 1968 decision is fully applicable retroactively to bar all recovery on New Jersey secondary mortgage loans made prior to that date and which were induced by the lender through intermediation of the nature described by paragraphs 1 and 2 above. All other New Jersey secondary mortgage loans of the type involved in this case made before September 11, 1968 which are not within paragraphs 1 and 2 above, and were not in litigation prior to that date remain unaffected by the judgment in this case.

■ The record shows that the trial court entered summary judgment against Mr. and Mrs. Stefanelli on their note to Oxford. Thus they had no opportunity to develop the facts respecting the intermediation by an alleged agent of Oxford which induced them to enter into the loan transaction. Under the circumstances, and even though their liability on the note is limited to installment payment without interest on the sum actually advanced to them by plaintiff, they are entitled to an opportunity to submit the facts to the trial court relating to intermediation. If such facts are undisputed and bring their case within paragraphs 1 and 2 above, they are entitled to a judgment exonerating them from liability on their note. If the evidence raises a factual dispute on the subject, the issue must be resolved by a jury or the court if the case is tried without a jury.

The judgment of the Appellate Division is affirmed as modified, and the cause is remanded to the trial court for proceedings consistent herewith.

WEINTRAUB, C. J. (dissenting). This case has an emotional overlay for it involves the distasteful business of lending

money at predatory rates to people who are poor or soon will be. I would add, irrelevantly to be sure, a regret that government does not provide loans at tolerable interest charges for those of our citizens who need them most. Instead, the impecunious are made a separate class, alone required to underwrite the high credit risk attributed to some of their number. But this having been said, the fact remains that this unpleasantness has legislative approval here and elsewhere, and the case must be decided in that light and not some personal one. Indeed, there is little to choose between the New Jersey and Pennsylvania statutes here involved. Labels aside, the sundry charges under the statutes permit about the same size gouge.

And it should be stressed that we are not, on this appeal, dealing with a lender who exacts more than either statute allows or who tolerates the intervention of a "broker" who adds a pillage of his own. I have no doubt that in such circumstances our courts should turn the lender away, and may do so without the aid of a statutory denunciation of the loan as unenforceable. Nor are we dealing with a situation in which the lender actually enters our State to recruit borrowers.[1] The record does not reveal how the sizeable number of New Jersey individuals found their way to Philadelphia. For all we know at the moment, it may have been in response to advertisements published or broadcast in Pennsylvania. What we do know is that the borrower went to Pennsylvania and the loan was made and was payable there, all in harmony with a Pennsylvania statute which also is designed to pro-

---

[1] This case is unlike *People v. Fairfax Family Fund, Inc.*, 235 *Cal. App.* 2d 881, 47 *Cal. Rptr.* 812 (Dist. Ct. App. 1964), appeal dismissed *sub nom. Fairfax Family Fund v. California*, 382 *U. S.* 1, 86 *S. Ct.* 34, 15 *L. Ed.* 2d 6 (1965), with respect to both the facts and the issue involved. There a Kentucky corporation solicited loans in California by mail and completed the loan transaction by mail after having a credit check made locally in California, and the question was not whether the loans should be forfeited but whether the lender should be restrained from continuing the business until a license was obtained.

tect the borrower. Nonetheless, the majority opinion in effect holds the New Jersey statute had a presence in Pennsylvania and denounced every such loan to a New Jersey resident, and this notwithstanding that if the loan were made in Pennsylvania on the terms of the New Jersey statute, the loan would have violated the Pennsylvania law.

If our Legislature ordained that every loan made anywhere in the world to a citizen of New Jersey shall be wholly void unless the loan is on terms authorized by New Jersey law, I suspect we would waste little time on that enactment. Yet this, I believe, is precisely the rule the majority opinion innovates and applies. This would be evident at once if the scene were not obscured by the fact that the lender took a "secondary mortgage" on New Jersey property as collateral. But the issue is not whether the mortgage is valid, but whether the loan itself is forfeited because of the existence of our statute, and upon that question the nature of the security cannot reasonably be pivotal.

Indeed, it is hard to grasp the true role of the mortgage under our statute. We can be sure the Legislature was not concerned with the integrity of the real property system of the State, for obviously the mortgage creates no title problem. Rather the Legislature must have had in mind the oppressive capacity of the threat of foreclosure. Yet the statute does not really implement that theme. The amount of the loan does not depend upon the value of the security. The loan may be in any amount whatever, provided only that the lender takes a "secondary mortgage." In this respect the Pennsylvania statute is more protective, for it, like most statutes permitting charges above the basic interest rate, at least fixes a monetary limit upon the loan. 7 *P. S.* § 6214A. And not only need there be no relationship under our statute between the value of the security and the amount of the loan, but more than that, the real property need not belong to the borrower or be his home, for the statute requires only "a mortgage upon any interest in real property used as a dwelling with accommodations for not more than 4 families."

*N. J. S. A.* 17:11A–1a. Nor must the property be in New Jersey, or the borrower a resident of this State.

One need not be unusually perceptive to see the fine hand of lenders in the drafting of this legislation, for, there being no required connection between the value of the security and the loan, the mortgage provision simply enables the lender to loan, at the high charges authorized by this statute, any amount the lender chooses to risk, provided only that the lender does not fail to take a secondary mortgage as a qualifying facade. Indeed, we were told in this case, and also at a public hearing held last year (with respect to whether the holder of a note and mortgage should be required to foreclose the mortgage before suing on the note), that the secondary mortgage (whatever its *in terrorem* effect may be on the borrower) is not, realistically, security for these loans; that the economics are such that a foreclosure is a waste of money and hence is rarely pursued.

In any event, the "secondary mortgage" is not so central to the fairness of the transaction as to distinguish this statute from any other of our usury statutes with respect to the immediate issue. *i. e.,* whether a loan made outside our State to a resident of our State is wholly void because, although obedient to the law of the State where the loan was negotiated, made and payable, the loan is not on terms which a statute of ours would permit if the loan were made here. If the Pennsylvania loan were made without the mortgage security (and under Pennsylvania law the lender is not required to take that security), the terms of the loan would still clash with those of our statute. There are sundry pressures which one State might permit and another might not, such as a chattel mortgage, or a wage assignment, or a power of attorney to confess judgment. The greatest oppression may be in the interest rate itself, and the threat of judicial enforcement of the promise to pay it. If it is correct to forfeit a foreign loan because a secondary mortgage was taken, it would be equally

correct to forfeit every such loan for any other departure from our domestic statutory scheme. That is why I believe the majority opinion must ultimately amount to this extraordinary proposition, that any loan to a New Jersey resident made anywhere is wholly void if it would violate our usury statutes if made here, even though the loan was authorized by the law of the place where it was negotiated, made and payable.

When we speak of "choice of law," we ought not to be blind to the consequences proposed. It may not be unreasonable to construe an insurance policy in accordance with the law of the place of residence of the assured, or to deny a specific remedy, or to limit the fruit of a transaction. But it should not be assumed that considerations which will lead to such consequences under "choice of law" will also support a forfeiture of what a party to the transaction has paid. It is one thing to refuse some measure of relief. It is dramatically different to denounce the transaction as void and to forfeit what was lawfully loaned under the law of the place of the loan.

As I understand them, the opinions in the Appellate Division and the majority opinion in our Court conclude that the Legislature itself dictated the "choice of law" and mandated the forfeiture of a loan negotiated, made and payable in another State. I cannot find a trace of any such legislative decision.[2] There is not a single provision in the statute which intimates that New Jersey residents will carry the statute in their pockets wherever they go. The statute speaks only of loans made here. *N. J. S. A.* 17:11A–2 requires the issuance of a "license," and *N. J. S. A.* 17:11A–

---

[2] Compare the provision of *N. J. S. A.* 17:10–20 of the "Small Loan Law," as amended by *L.* 1967, *c.* 94, § 16, which speaks expressly of loans made elsewhere to a resident of our State and which purports to deny enforcement of such loans except when "the amount of interest, discount, consideration or other charges for such loan, demanded to be paid in such action, does not exceed that permitted to a licensee by this chapter for a loan of the same amount payable in the same manner."

17 requires the licensee to keep books and records, not in Pennsylvania, Arizona, California, or Hawaii, but "at its place or places of business in this State." That the statute was intended to deal only with loan transactions within this State is perfectly evident from *N. J. S. A.* 17:11A–3, which required (unconstitutionally, as later adjudged) that an applicant for a license "shall have been a bona fide resident of this State for a period of at least 2 years prior to the date of filing the application for such license" and that in the case of a corporate applicant, the holder or holders of at least 50% of the stock "shall have resided in this State for a period of at least 2 years prior to the date of filing the application." In view of those terms, it cannot be said the Legislature itself made a "choice of law" and dictated that whenever a conflict-of-laws problem arises, the courts must apply the provision of *N. J. S. A.* 17:11A–29 that "No obligation arising out of a secondary mortgage loan shall be enforceable in the courts of this State unless such loan was negotiated and made in full compliance with the provisions of this act." Indeed, that view of the statute must condemn it as plainly arbitrary, for the statute would then mean that a secondary mortgage upon the real property described in the statute will void every loan, made upon any terms whatever, unless the loan is made by someone who is licensed under this statute and is present in New Jersey.

The "choice of law" issue is in our hands without any legislative prescription. I think it unreasonable to forfeit a loan upon the factual hypothesis now before us. Rather, the sensible course is to sustain the transactions with whatever modification our local policy may be thought to mandate. Thus, if the interest rate is found to be hostile to a strong legislative policy, it may be reduced. Here, as already noted, the Pennsylvania statute and the New Jersey statute seem to authorize, nomenclature to one side, the same total exaction from the borrower. Or if the secondary mortgage as such is thought to be intolerably offensive to our statute, we could

order the mortgage cancelled. So, too, we could deny any other remedy the loan agreement may give the lender if that remedy is thus offensive. See *Restatement Second, Conflict of Laws, Part II* (Proposed Official Draft, 1968), §§ 195 and 203. Indeed, such relief, if justified, should not be limited to borrowers who were or are residents of our State, for the same policy considerations must protect as well any borrower the lender pursues in our jurisdiction.

It should be remembered that other States can do what we do. Our statute does not forbid loans to residents of Pennsylvania, and a New Jersey lender would violate our statute if it made a loan here on the terms of the Pennsylvania statute. The courts of Pennsylvania could give our lender the same treatment we here accord its domiciliary. I think this is shortsighted and at war with the considerations of comity which attend a choice of law. One can foresee still a further complication. If a Pennsylvania lender obtains judgment against a New Jersey borrower by service under a Pennsylvania long-arm statute, what then? We need not invite this discord to vindicate our State policy.

Hence, wholly apart from any constitutional issue, we should not forfeit the loan negotiated, made and payable in another State merely because the borrower was a resident of New Jersey and the terms of the loan, valid where made, do not coincide with what our statute requires or permits. I would reverse the judgment and remand the matter to the trial court for trial of the remaining issues, including the question whether there was an unauthorized brokerage charge to the knowledge of the lender.

HALL and HANEMAN, J. J., join in this dissenting opinion.

*For affirmance*—Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—4.

*For reversal*—Chief Justice WEINTRAUB and Justices HALL and HANEMAN—3.