767 A.2d 469

SASCO 1997 NI, LLC, A DELAWARE LIMITED LIABILITY COMPA-NY, SUCCESSOR-IN-INTEREST TO ALI, INC., A DELAWARE CORPORATION, PLAINTIFF–APPELLANT, v. ARIK A. ZUDKE-WICH AND ROCHELLE ZUDKEWICH, DEFENDANTS–RE-SPONDENTS.

Argued October 23, 2000—Decided March 1, 2001.

580

*Jonathan T.K. Cohen* argued the cause for appellant (*Fischbein Badillo Wagner Harding*, attorneys; *Mr. Cohen, Jamiee Katz Sussner* and *Bruce D. Vargo*, on the briefs).

*Michael S. Etkin* argued the cause for respondents (*Lowenstein Sandler*, attorneys).

*Joseph Lubertazzi, Jr.*, argued the cause for amici curiae New Jersey Bankers Association, Summit Bank and Valley National Bank (*Jamieson, Moore, Peskin & Spicer*, attorneys for New Jersey Bankers Association, and *McCarter and English*, attorneys for Summit Bank and Valley National Bank; *Mr. Lubertazzi* and *Dennis R. Casale*, of counsel; *Steven Beckelman, Sheila E. Calello, Joseph R. Scholz* and *Chaviva B. Schoffman*, on the brief).

The opinion of the Court was delivered by

ZAZZALI, J.

In this case, defendant Arik Zudkewich personally guaranteed two large commercial loans in 1989. Within months he transferred his home, later sold for $1.2 million, to his wife for $1.00. The lender gave notice of default to the primary obligor in December 1994, and judgment was entered in July 1997 against defendant. In April 1998, the creditor sued to set aside the transfer as fraudulent under New Jersey's Uniform Fraudulent Transfer Act (UFTA), *N.J.S.A.* 25:2–20 to –34. The trial court dismissed that claim as untimely, and the Appellate Division affirmed.

There are two issues presented: (1) whether the four-year UFTA statute of limitations commenced at the time of the transfer or at the time of the judgment; and (2) when could the creditor "reasonably have ... discovered" the transfer, the event that starts the running of the one-year tolling provision of the statute. We hold that the four-year provision runs from the date of

transfer, rather than the date of judgment. SASCO did not file suit within four years of the date of transfer, and therefore does not fall within that provision. We also conclude that a reasonable commercial creditor would have performed an asset search, at the very latest, when it gave formal notice of default to the primary obligor. The interests of justice require that we apply that holding purely prospectively. Therefore, although SASCO did not comply with that rule, we reverse and remand for the trial court to adjudicate SASCO's UFTA claim.

## I.

On December 19, 1989, Midlantic Bank, N.A., (Midlantic), plaintiff's predecessor-in-interest, loaned $2.9 million to Gateway 195 (Gateway), a partnership formed to develop commercial real estate. Defendant Arik A. Zudkewich was one of Gateway's nine general partners. Two large parcels of commercial real estate in Hamilton secured the loan. In addition, all of Gateway's general partners, including Zudkewich, gave Midlantic personal guaranties. Midlantic subsequently assigned the loan to ALI Inc. (ALI).

On December 6, 1994, ALI gave Gateway formal notice that it considered Gateway in default and demanded immediate payment. Later that month, ALI filed a complaint in the Law Division against Gateway and eight of the general partners, Zudkewich included. In March 1995, Gateway declared bankruptcy. ALI, Gateway, and five of the eight general partners named in the lawsuit, not including Zudkewich, entered into a settlement agreement. That settlement was coordinated with the resolution of the bankruptcy proceeding. Gateway agreed to transfer the two Hamilton properties to ALI and sell four other properties to reduce the outstanding balance on the loan. Gateway was unable to pay the full balance, so ALI continued with the Law Division action against Zudkewich and the two other partners who did not settle. When it appeared that ALI was going to obtain a default judgment against Zudkewich, ALI ordered an investigative search on his assets. In early August 1997, ALI obtained the judgment

in the total amount of $1,300,347.50. At about the same time, ALI transferred its interests in the litigation to plaintiff, SASCO 1997 NI, LLC, (SASCO),[1] for a nominal fee.

The asset search disclosed that on May 1, 1990, a few months after Zudkewich personally guaranteed the loan, he transferred his interest in the marital residence to his wife, Rochelle, for $1.00. The home was later sold for $1.2 million.

Zudkewich and Rochelle recorded the deed of transfer on May 8, 1990, and the property was sold in 1992. They moved into a new home in Millburn. That home was later sold for a profit of approximately $1.5 million, and the Zudkewiches then moved into a Short Hills home. Rochelle alone was named on the title of the Millburn and Short Hills properties.

On April 23, 1998, SASCO filed a complaint against Zudkewich and Rochelle, alleging a violation of the UFTA, fraud, conversion, unjust enrichment, and requesting imposition of a constructive trust. Defendants moved to dismiss, contending that the UFTA's statute of limitations barred SASCO's claims. The Law Division granted the motion, and SASCO appealed. The Appellate Division affirmed in an unpublished opinion. We granted certification, 163 *N.J.* 397, 749 *A.*2d 370 (2000), and allowed the New Jersey Bankers Association, Summit Bank, and Valley National Bank to appear as *amici curiae.*

## II.

In 1984, the National Conference of Commissioners on Uniform State Laws (Commissioners) approved the UFTA. At least thirty-nine states and the District of Columbia have since adopted the UFTA, either in whole or in part. In 1988, New Jersey enacted the UFTA, *L.* 1988, *c.* 74, § 1, to replace this State's Uniform Fraudulent Conveyance Act (UFCA), which had been the law since 1919. *Flood v. Caro Corp.,* 272 *N.J.Super.* 398, 403, 640

---

[1] For simplicity, SASCO hereinafter also refers to Midlantic and ALI.

*A*.2d 306 (App.Div.1994). Prior to the UFTA "[s]tatutes of limitations applicable to the avoidance of fraudulent transfers and obligations var[ied] widely from state to state and [were] frequently subject to uncertainties in their application." *Uniform Fraudulent Transfers Act* comment 2 on § 9, 7A *U.L.A.* 643, 666 (1984). To remedy those inconsistencies, the Commissioners recommended the enactment of a uniform statute of limitations. *Ibid.* The Commissioners intended section 9 of the UFTA to "mitigate the uncertainty and diversity that have characterized the decisions applying statutes of limitations to actions to fraudulent transfers and obligations." *Ibid.* New Jersey accepted that recommendation and enacted Section 9 essentially verbatim. *L.* 1988, *c.* 74, § 1 (codified at *N.J.S.A.* 25:2–31). That section provides:

> A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:
>
> a. Under subsection a. of [*N.J.S.A.*] 25:2–25, *within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;*
>
> b. Under subsection b. of [*N.J.S.A.*] 25:2–25 or subsection a. of [*N.J.S.A.*] 25:2–27, within four years after the transfer was made or the obligation was incurred; or
>
> c. Under subsection b. of [*N.J.S.A.*] 25:2–27, within one year after' the transfer was made or the obligation was incurred.
>
> [*N.J.S.A.* 25:2–31 (emphasis added).]

SASCO contends that Zudkewich transferred the property with "actual intent to hinder, delay, or defraud," *N.J.S.A.* 25:2–25a, and therefore that its claim is subject to the statute of limitations set forth in *N.J.S.A.* 25:2–31a. That section contains two provisions. The first requires that a claimant file suit within four years after the date of transfer. *Ibid.* The second provides that if a claimant files after that period, the complaint is nonetheless timely if filed within one year after the date the claimant discovered or "could reasonably have ... discovered" the transfer. *Ibid.* The issue here is whether SASCO's complaint was timely under either provision.

"[W]hen interpreting a statute, our overriding goal must be to determine the Legislature's intent." *State, Dep't of Law & Pub. Safety v. Gonzalez*, 142 *N.J.* 618, 627, 667 *A*.2d 684 (1995); *accord Roig v. Kelsey*, 135 *N.J.* 500, 515, 641 *A*.2d 248 (1994); *Lesniak v. Budzash*, 133 *N.J.* 1, 8, 626 *A*.2d 1073 (1993). "Ordinarily, the language of the statute is the surest indicator of the Legislature's intent." *Alan J. Cornblatt, P.A. v. Barow*, 153 *N.J.* 218, 231, 708 *A*.2d 401 (1998) (citing *Strasenburgh v. Straubmuller*, 146 *N.J.* 527, 539, 683 *A*.2d 818 (1996)). "If the language is plain and clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms." *State, Dep't of Law & Pub. Safety v. Bigham*, 119 *N.J.* 646, 651, 575 *A*.2d 868 (1990). In addition to the provision in question, we also consider the overall legislative scheme. *Fiore v. Consolidated Freightways*, 140 *N.J.* 452, 466, 659 *A*.2d 436 (1995). "Our task is to harmonize the individual sections and read the statute in the way that is most consistent with the overall legislative intent." *Ibid.*

### III.

SASCO first asks us to interpret the four-year provision of *N.J.S.A.* 25:2–31a to run from the date it obtained the judgment against Zudkewich. That section, as noted, provides in part that a plaintiff must file an action "within four years after the transfer was made." *N.J.S.A.* 25:2–31a. Thus, the explicit language provides that the four-year provision runs from the date of transfer rather than the date of judgment. That language is the surest indicator of the Legislature's intent. *Cornblatt, supra*, 153 *N.J.* at 231, 708 *A*.2d 401. Here, the complaint was not filed until eight years after the transfer. Therefore, the plain language of the statute demonstrates that SASCO's complaint was untimely.

SASCO's request also conflicts with another portion of the UFTA, *N.J.S.A.* 25:2–21, which defines a "[c]laim" under the UFTA to include "a right to payment, *whether or not the right is reduced to judgment.*" *N.J.S.A.* 25:2–21 (emphasis added). "The

UFTA does not prevent a present or future 'creditor' from seeking a remedy prior to judgment." *Intili v. DiGiorgio*, 300 *N.J.Super.* 652, 659, 693 *A.*2d 573 (Ch.Div.1997) (citations and footnotes omitted); *see Flood v. Caro Corp., supra,* 272 *N.J.Super.* at 405, 640 *A.*2d 306 ("Any creditor, *with or without a judgment,* may prosecute a suit . . . to avoid the transfer to the extent necessary to satisfy the claim . . . .") (emphasis added). Thus, the explicit language of the UFTA demonstrates that the date of judgment is not critical to the limitations provisions of the UFTA.

The Commissioners' adoption of the UFTA supports that conclusion. Under an English statute enacted in 1571, during the reign of Queen Elizabeth I, a judgment generally was a prerequisite to a fraudulent conveyance action. Peter A. Alces & Luther M. Dorr, Jr., *A Critical Analysis of the New Uniform Fraudulent Transfer Act,* 1985 *U. Ill. L.Rev.* 527, 532 n. 32 (1985). That requirement was accepted in the United States in some jurisdictions. *Ibid.* The UFTA's predecessor, the UFCA, eliminated that rule. *Id.* at 536. Elizabethan England may have required a judgment as a condition precedent to a fraudulent conveyance action in 1571 but New Jersey did not impose such a prerequisite when Zudkewich made this transfer in 1990. Therefore, both the explicit language of and the intent underlying the UFTA demonstrate that the statute operates without regard to when the creditor obtains a judgment. That fact substantially undermines SASCO's contention that the date of judgment determines when the four-year provision begins to run.

SASCO points to an out-of-state decision concluding that the UFTA four-year limitations period should commence on the date the creditor obtains a judgment in the underlying action and not on the date of the challenged transfer. *Cortez v. Vogt,* 52 *Cal. App.*4th 917, 60 *Cal.Rptr* .2d 841, 843 (1997) ("[W]here an alleged fraudulent transfer occurs while an action seeking to establish the underlying liability is pending, and where a judgment establishing the liability later becomes final, we construe the four-year limitation period [of UFTA § 9], i.e., the language 'four years after the

transfer was made or the obligation was incurred,' to accommodate a tolling until the underlying liability becomes fixed by a final judgment."); *see also Eskridge v. Nalls,* 852 *P.*2d 818, 820 (Okla. Ct.App.1993) (holding that Oklahoma's general fraud statute of limitations did not run on pre-UFTA fraudulent conveyance action until underlying litigation was reduced to judgment, and expressly refusing to decide the issue under the UFTA). Other jurisdictions have concluded differently. *See, e.g., Levy v. Markal Sales Corp.,* 311 *Ill.App.*3d 552, 244 *Ill.Dec.* 120, 724 *N.E.*2d 1008, 1014 (2000) ("[T]he four-year [UFTA] limitation period . . . commences from the date the transfer is made, and not on the date judgment is entered."), *appeal denied,* 189 *Ill.*2d 660, 246 *Ill.Dec.* 915, 731 *N.E.*2d 764 (2000); *First Southwestern Fin. Servs. v. Pulliam,* 121 *N.M.* 436, 912 *P.*2d 828, 830 (1996) (holding that UFTA limitation commences on date of transfer); *Supreme Bakery, Inc. v. Bagley,* 742 *A.*2d 1202, 1205 (R.I.2000) (holding that UFTA's four-year provision runs from date of transfer). We agree with the latter decisions. The explicit language of the UFTA provides that the four-year provision runs from the date "the transfer was made," *N.J.S.A.* 25:2–31a, and indicates that the Legislature concluded that the date of judgment was not determinative of the timeliness of claims under the UFTA. *N.J.S.A.* 25:2–21. We cannot ignore that intent. SASCO filed its complaint eight years after the transfer was made, and the complaint was therefore untimely.

## IV.

■ The analysis then shifts to the one-year tolling provision to determine if SASCO's complaint was timely under that provision. As noted, if the action is brought after the expiration of the four-year period, it will be considered timely if it is filed "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." *N.J.S.A.* 25:2–31a.

There are two possible constructions of that statutory language. The first is that "could reasonably" refers to the means by which the claimant can uncover the transfer or obligation. Under that

interpretation, the applicability of the tolling provision hinges upon whether the specific claimant, SASCO here, by using reasonable means, could have discovered the transfer. Commercial creditors request asset searches frequently. Thus, if SASCO's predecessors had conducted a timely search they undoubtedly would have uncovered the transfer. Under that interpretation, SASCO would have had to file within one year of the date of the transfer because an asset search could have uncovered the transfer as early as the date the deed was recorded.

However, another interpretation of the statutory language is that "could reasonably" refers to the claimant, rather than the means of uncovering the transfer. Under that interpretation, the critical issue is when an objectively reasonable claimant would have discovered the transfer. Because there are two possible interpretations, we must look behind the plain language to discern the Legislature's true intent.

The Commissioners drafted the tolling provision to mirror the common-law discovery rule which, they noted, was generally applicable to fraud actions. *National Conference of Commissioners on Uniform State Laws, Proceedings in Committee of the Whole on the Uniform Fraudulent Transfer Act* 117 (July 29, 1984); *id.* at 112 (quoting one commissioner, who stated that "[t]here are a whole host of bodies of law on tolling the statute of limitations, and ... section (a)' incorporate[s] one of them specifically in the statute, in terms of discovery"); *see id.* at 116, 117 (stating that the tolling provision would not run until "discovery or reasonable opportunity to discover"). New Jersey applied the discovery rule to fraud actions long before the UFTA, creating the inference that by accepting the Commissioners' recommendation and enacting § 9 almost verbatim, the Legislature intended the tolling provision to follow New Jersey's discovery rule jurisprudence. See *Lopez v. Swyer*, 62 *N.J.* 267, 275 n. 2, 300 *A.*2d 563 (1973) ("In case of fraud the period of limitation, in equity, begins to run only from the discovery of the fraud or the time when, by reasonable diligence, it could have been discovered."); *Dreier Co., Inc. v. Unitronix Corp.,*

218 *N.J.Super.* 260, 274, 527 *A.*2d 875 (App.Div.1986); *Partrick v. Groves,* 115 *N.J. Eq.* 208, 211, 169 *A.* 701 (E. & A.1934); *Giehrach v. Rupp,* 112 *N.J. Eq.* 296, 302–03, 164 *A.* 465 (E. & A.1933); *Sun Bldg. & Loan Ass'n v. Rashkes,* 119 *N.J. Eq.* 443, 451, 183 *A.* 274 (Ch.1936); *Lincoln v. Judd,* 49 *N.J. Eq.* 387, 389, 24 *A.* 318 (Ch.1892). Thus, the Legislature intended to incorporate the discovery rule jurisprudence applicable to fraud actions into the tolling provision of *N.J.S.A.* 25:2–31a. That intent demonstrates conclusively that the critical question is when a reasonable commercial creditor would have known about the transfer, rather than whether SASCO could, using reasonable means, have discovered the transfer. See *Freitag v. McGhie,* 133 *Wash.*2d 816, 947 *P.*2d 1186, 1189 (1997) ("We ... hold the discovery rule is also incorporated into the UFTA statute of limitations.").

■ SASCO and *amici* contend that a reasonable commercial creditor would not perform an asset search on a guarantor until after it obtains a judgment against the guarantor. They base that conclusion on certifications submitted by counsel and two employees of companies involved in the commercial lending industry, all of whom assert that no commercial creditor requests pre-judgment asset searches. SASCO and *amici,* however, blink the distinction between the industry standard and reasonableness. The industry standard is not necessarily determinative of how a reasonable creditor would behave. See *Wellenheider v. Rader,* 49 *N.J.* 1, 7, 227 *A.*2d 329 (1967) ("[P]roof of an industry custom is not dispositive of the question of duty. The standard of conduct is reasonable care, that care which a prudent [person] would take in the circumstances. The customs of an industry are not conclusive on the issue of the proper standard of care; they are at most evidential of this standard."); *Thermographic Diagnostics, Inc. v. Allstate Ins. Co.,* 241 *N.J.Super.* 88, 90, 574 *A.*2d 485 (App.Div. 1990) ("[P]roof of an industry custom is not conclusive on the issue of reasonableness but merely evidential."), *aff'd,* 125 *N.J.* 491, 516, 593 *A.*2d 768 (1991); *cf. Klimko v. Rose,* 84 *N.J.* 496, 506 n. 4, 422 *A.*2d 418 (1980) ("[A]n industry or professional standard or custom

... is not conclusive if, regardless of the standard or custom, the exercise of reasonable care would call for a higher standard. . . ."). While not determinative, that standard does inform our decision.

SASCO's interpretation undermines considerations of judicial economy, because it would encourage a creditor to file suit against a guarantor before determining whether the guarantor had any assets. If the guarantor did not, the creditor would nonetheless engage in lengthy and costly litigation to reduce the guarantee to a judgment that may prove worthless. Not only would a reasonable creditor not follow such a course, that rule would encourage unnecessary litigation contrary to public policy. See *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 350–51, 476 *A.2d* 250 (1984) (stating that "prevention of needless litigation" and "reduction of unnecessary burdens of time and expense" "have a central place in the adjudication of all legal controversies") (quoting *City of Hackensack v. Winner,* 82 *N.J.* 1, 32, 410 *A.2d* 1146 (1980)). We note the apparent inconsistency in SASCO's assertion that performing an asset search prior to obtaining a judgment "is considered a wasteful expenditure," when instituting costly litigation that may ultimately end in a worthless judgment is not. SASCO's interpretation also would allow a creditor to defer its fraudulent conveyance claim until a judgment has been obtained against the debtor, which undermines the core purposes of a statute of limitations, eliminating stale claims and creating repose. *Martinez v. Cooper Hosp.–Univ. Med. Ctr.,* 163 *N.J.* 45, 51–52, 747 *A.2d* 266 (2000). For those reasons, we reject SASCO's contention. In our view, a reasonable creditor would perform an asset search when the loan goes into default. At that time, the creditor would seek to obtain all pertinent information, including an asset search of the guarantors, in order to make a fully informed decision about how to proceed. The creditor then presumably would refrain from instituting litigation against a guarantor it knew to be judgment-proof, thus avoiding unnecessary litigation that not only inconveniences the parties but burdens the judicial system.

*Amici* urge us to avoid adopting a rule that would require commercial creditors to run investigative searches on every guarantor every four years, regardless of whether the loans are in default. According to *amici* and SASCO, asset searches cost between $1,000 and $1,500 per guarantor, and can exceed $2,000. Such a rule would impose substantial costs on commercial creditors that they would likely pass on to borrowers, increasing the cost of credit. Although we do not foresee the banking apocalypse proffered by *amici,* our conclusion is sensitive to those concerns. Commercial creditors will have to perform asset searches only when a debtor defaults on a loan, rather than on every guarantor every four years, assuaging the fears of *amici* concerning the burden on commercial creditors. Our conclusion also avoids the risk that commercial creditors will have to file suit under the UFTA when the loan is still performing, which could create a strained relationship between debtor and creditor.

At the latest, the Gateway loan was in default in December of 1994.[2] A reasonable commercial creditor would have conducted an asset search at that time. Because that search would have disclosed the transfer, SASCO had until December of 1995 to file a complaint. SASCO did not file until December of 1998. Therefore, the complaint was untimely.

For a creditor to fail to act when a debtor defaults on the loan is not reasonable. Prudence dictates that the creditor fully investigate the situation prior to instituting costly and lengthy litigation that may ultimately prove fruitless. That result is sensitive to interests of judicial economy, as well as to the valid concerns of lenders. Under our conclusion, the necessary searches will be fewer in number than the parade of horribles presented by SASCO and *amici,* and will not unduly burden lenders.

---

[2] We need not determine precisely when the loan went into default because, even assuming that it did so just before SASCO gave notice of the default in December of 1994, the complaint was untimely.

## V.

SASCO also contends that we should remand to the trial court for a hearing to determine the reasonableness of its conduct. Generally, a trial court should conduct a hearing on that issue when the plaintiff alleges that he or she falls within the discovery rule. *Lopez, supra*, 62 *N.J.* at 274–76, 300 *A.*2d 563. However, when there are no issues of credibility, the motion court may decide the issue without a hearing and may instead rely on affidavits or certifications. *Id.* at 275, 300 *A.*2d 563; *Lapka v. Porter Hayden Co.*, 162 *N.J.* 545, 557–58, 745 *A.*2d 525 (2000). There is no factual dispute in this case that would require a hearing. It is undisputed that SASCO did not file a complaint until four years after it declared the loan in default. Therefore, a remand is unnecessary. *Lapka, supra*, 162 *N.J.* at 558, 745 *A.*2d 525 ("[B]ecause the record here unquestionably establishes plaintiff's awareness of the essential facts, no formal hearing was necessary to resolve the discovery rule issue.").

We also affirm the dismissal of SASCO's claims of fraud, conversion, unjust enrichment, and constructive trust. SASCO has not demonstrated fraud *prima facie* because it has not proven "a material misrepresentation of a presently existing or past fact." *Gennari v. Weichert Co. Realtors*, 148 *N.J.* 582, 610, 691 *A.*2d 350 (1997). SASCO also cannot prove that defendants exercised improper control over its property, and therefore failed to state a claim for conversion. *Charles Bloom & Co. v. Echo Jewelers*, 279 *N.J.Super.* 372, 381, 652 *A.*2d 1238 (App.Div.1995). SASCO also has failed to "show both that defendant received a benefit and that retention of that benefit without payment would be unjust," such that its unjust enrichment claim must fail. *VRG Corp. v. GKN Realty Corp.*, 135 *N.J.* 539, 554, 641 *A.*2d 519 (1994). We decline to impose a constructive trust based on the facts in this record.

## VI.

Finally, we must determine whether our decision should follow the general rule of retroactivity or whether we should apply

the rule prospectively. "Prospective application is appropriate when a decision establishes a new principle of law by overruling past precedent or by deciding an issue of first impression." *Montells v. Haynes*, 133 *N.J.* 282, 295, 627 *A.*2d 654 (1993). In making that determination, we must also consider whether retro-activity furthers the purpose of our decision and whether applying the decision retroactively would produce "substantial inequitable results." *Ibid.* Those considerations lead us to the conclusion that our decision should apply purely prospectively, more specifically, to transfers that occur after the date of this opinion.

■ Our decision today addresses an issue of first impression. No New Jersey court has interpreted the one-year tolling provi-sion of *N.J.S.A.* 25:2–31 until this case. There is a paucity of out-of-state caselaw on the issue. With little guidance, SASCO rea-sonably relied on a plausible, although incorrect, interpretation of the law. Prospective application is proper when " 'a court renders a first-instance or clarifying decision in a murky or uncertain area of the law,' or when a member of the public could reasonably have 'relied on a different conception of the state of the law.' " *Montells, supra*, 133 *N.J.* at 298, 627 *A.*2d 654 (quoting *Oxford Consumer Discount Co. v. Stefanelli*, 104 *N.J.Super.* 512, 521, 250 *A.*2d 593 (App.Div.1969), *aff'd*, 55 *N.J.* 489, 262 *A.*2d 874 (1970)). Penalizing SASCO, which relied on a reasonable interpretation of the law, is inequitable.

SASCO also reasonably relied on a practice apparently domi-nant throughout the industry. In light of that practice, retroac-tive application would likely preclude creditors from recovery in a substantial number of cases, greatly prejudicing not only SASCO, but the entire commercial lending industry. See *Rutherford Educ. Ass'n v. Board of Educ.*, 99 *N.J.* 8, 28, 489 *A.*2d 1148 (1985) (considering during prospectivity analysis the financial impact on boards of education generally); *Cogliati v. Ecco High Frequency Corp.*, 92 *N.J.* 402, 416–17, 456 *A.*2d 524 (1983) (considering during prospectivity analysis possible liability incurred by sellers of real property). The purpose of the rule, to instruct commercial credi-

tors to conduct asset searches at the time of default, would not be served by penalizing either SASCO in this case or commercial creditors generally. Based on those concerns, we conclude that pure prospectivity is appropriate in this case.

While pure prospectivity is appropriate regardless of the strength of SASCO's claim, the equities involved also support the conclusion that SASCO should be allowed to proceed. We assume that SASCO is a savvy lender that knew the loan was in default in December of 1994 and made a business decision not to incur the costs of an investigative search. We would have less difficulty concluding that SASCO should suffer the consequences of that decision in more benign circumstances. Here, however, our decision could allow Zudkewich to escape liability. Without deciding the issue, *Miller v. Estate of Sperling,* 166 *N.J.* 370, 386, 766 *A.*2d 738 (2001) (refusing to decide proximate cause issue because parties had not had opportunity to brief and argue issue and did not request adjudication on that ground), we can fairly infer, on the facts elucidated to date, that Zudkewich fraudulently transferred his interest in the home to avoid paying on the guarantee. Assuming that to be the case, Zudkewich played a suburban shell game to hide homes and avoid creditors. It is thus inequitable to hold that SASCO, despite its sophistication, cannot have its day in court to prove that fact and, if so, thereupon recover that amount from Zudkewich. Above all, "[o]ur tradition is to confine a decision to prospective application when fairness and justice require." *Montells, supra,* 133 *N.J.* at 297, 627 *A.*2d 654. The ostensible merit of SASCO's claim is neither the linchpin of, nor necessary to, the determination of whether to apply our holding prospectively. However, that consideration reinforces our conclusion.

SASCO, as we have discussed, contends that the one-year tolling provision should run from the date of judgment. Although we disagree, that position is not unreasonable. More to the point, our prior caselaw has not addressed the one-year provision in a definitive way. SASCO also reasonably relied upon the predomi-

nant industry practice, which is to wait until judgment to conduct an asset search. We are satisfied that in this case running the one-year provision from judgment is fair, in light of the unsettled state of the law and SASCO's reliance on the industry standard. Therefore, we conclude that SASCO timely filed its UFTA complaint, and we reverse and remand.

## VII.

In summary, we conclude that the four-year limitations period runs from the date of the transfer, rather than from the date the commercial creditor obtains a judgment against the guarantor. We also reject SASCO's contention that a reasonable commercial creditor would not perform an investigative search until after obtaining a judgment against a guarantor of the underlying loan. Instead, we hold that a reasonable creditor would perform that search at the time of default. Our decision applies to all conveyances after the date of this opinion, and does not apply to this case. We therefore reverse and remand for the trial court to adjudicate SASCO's UFTA claim.

*For affirmance in part; reversal in part*–Chief Justice PORITZ, and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.