**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3728-23
                A-3753-23

DEFENSE ACQUISITION
PROGRAM ADMINISTRATION,
REPUBLIC OF KOREA,

      Plaintiff-Respondent,

v.

DECK WON KANG, a/k/a
BRYANT KANG, JOO HEE KIM,
a/k/a LAUREN KIM, BRYANT
KANG, WILLIAM KANG, GMB
(USA), INC., a/k/a GMB USA, INC.,
HACKENCO, INC., DBNJW, INC.,
and 78 ROBERTS ROAD, LLC,

      Defendants-Appellants,

and

PRIMACY ENGINEERING, INC.,
and RECOVCO MORTGAGE
MANAGEMENT, LLC, d/b/a
SPROUT MORTGAGE,

      Defendants.

_____

DEFENSE ACQUISITION
PROGRAM ADMINISTRATION,
REPUBLIC OF KOREA,

 Plaintiff-Respondent,

v.

DECK WON KANG, a/k/a
BRYANT KANG, JOO HEE KIM,
a/k/a LAUREN KIM, BRYANT
KANG, WILLIAM KANG, GMB
(USA), INC., a/k/a GMB USA, INC.,
HACKENCO, INC., DBNJW, INC.,
78 ROBERTS ROAD, LLC, and
RECOVCO MORTGAGE
MANAGEMENT, LLC, d/b/a
SPROUT MORTGAGE,

 Defendants,

and

PRIMACY ENGINEERING, INC.,

 Defendant-Appellant.

_____

Argued December 9, 2025 – Decided June 2, 2026

Before Judges Rose, DeAlmeida and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-6733-19.

Scott M. Weingart argued the cause for appellants in A-3728-23 and appellant in A-3753-23 (McCarter &

English LLP and OGC Solutions LLP, attorneys; Robert A. Mintz, Geoffrey N. Rosamond, Scott M. Weingart, and Alexander J. Anglim, on the briefs).

R. James Kravitz, argued the cause for respondent in A-3728-23 and A-3753-23 (Fox Rothschild LLP, attorneys; R. James Kravitz and Melanie E. Getz, on the brief).

PER CURIAM

These consolidated appeals arise from an action filed by plaintiff Defense Acquisition Program Administration, Republic of Korea, a government agency of the Republic of Korea, to facilitate collection of two judgments confirming arbitration awards totaling approximately $75 million against two New Jersey corporations that supplied military equipment to Korea pursuant to procurement contracts obtained through bribery. In its complaint, plaintiff sought to pierce the corporate veil of the two corporations and have their owners declared personally liable for the judgments, set aside numerous transactions pursuant to the Uniform Fraudulent Transfer Act (UFTA), N.J.S.A. 25:2-20 to -34, and impose successor entity liability on one entity. The motion court granted summary judgment to plaintiff on many of its claims. A jury reached a verdict in favor of plaintiff on the claims not resolved by motion.

Defendants Deck Won Kang (Kang), Joo Hee Kim (Kim), Bryant Kang (Bryant), William Kang (William)[1] (collectively the Kang Family), GMB (USA) Inc. (GMB), Hackenco, Inc. (Hackenco), DBNJW, Inc. (DBNJW), 78 Roberts Road, LLC (78 Roberts Road), and Primacy Engineering, Inc. (Primacy) appeal from the July 26, 2024 Law Division judgment incorporating the motion court's summary judgment decisions and the jury's verdict, as well as two earlier orders resolving pretrial motions. We affirm in part, vacate in part, and remand for further proceedings.

## I.

1.    The Contracts.

Plaintiff was part of the executive branch of the Korean government responsible for, among other things, defense procurement. GMB and Hackenco were New Jersey corporations with their principal places of business in this state. Both companies were owned by Kang and Kim, spouses who resided in this state. The companies had no other shareholders and were engaged in engineering and assistance integration, the sale of military equipment, and importing and exporting goods.

---

[1] Because Bryant Kang and William Kang share a surname with their father, Deck Wong Kang, we refer to them by their first names to avoid confusion. We intend no disrespect.

On December 2, 2009, and December 28, 2010, plaintiff executed two contracts with Hackenco to purchase military equipment. On December 28, 2010, and May 31, 2011, plaintiff executed two contracts with GMB to purchase military equipment. Each contract contained a provision requiring disputes be resolved through arbitration before the Korean Commercial Arbitration Board (KCAB) in Seoul.

The United States Department of Justice alleged Kang obtained the contracts "through corrupt and fraudulent means, specifically by paying bribes to" a high-ranking procurement officer in the Korean Navy. Kang pleaded guilty in the District of New Jersey to "agreeing to and then making approximately $100,000 in illegal payments to and for the benefit of a foreign official in exchange for improper business advantages" between January 2009 and February 2013, in relation to the contracts, in violation of the Foreign Corrupt Practices Act, 15 U.S.C.A. § 78dd-2. The bribery scheme used GMB affiliates in Australia to funnel illegal payments to the official. As part of the plea agreement, Kang agreed to "forfeit to the United States all of his right, title, and interest in $1,500,000."[2]

---

[2] In 2015, Kang was convicted by the Seoul High Court of crimes involving other bribes made to secure the contracts and spent two years in a Korean jail.

A-3728-23

From the start of the contracts through 2014, plaintiff made over $90 million in payments to Hackenco and GMB. Kang paid the bribes out of the funds the companies received from plaintiff.

2.     <u>The Korean Arbitration Awards.</u>

Disputes arose between the parties regarding the contracts. Ultimately, plaintiff terminated the agreements. Hackenco and GMB initiated separate arbitrations before the KCAB.

On December 14, 2014, Hackenco commenced arbitration against plaintiff before the KCAB, seeking a declaration the Hackenco contracts were valid and effective. In March 2015, plaintiff filed a counterclaim seeking to recover funds paid Hackenco under the contracts. Plaintiff also asserted a counterclaim against Kang and Kim, seeking to pierce Hackenco's corporate veil and have them declared liable for any arbitration award issued against Hackenco.

On May 30, 2016, the KCAB issued an award in favor of plaintiff and against Hackenco for $26,237,340, plus interest, $48,061,380, plus interest, and ₩4,382,504,582, plus interest, based on the arbitration panel's conclusion Hackenco failed to perform under the contracts. The panel dismissed the counterclaim because Kang and Kim were not bound by the arbitration agreement and the panel did not have authority to hear the veil piercing claim.

A-3728-23

On September 8, 2015, GMB commenced arbitration against plaintiff before the KCAB, alleging wrongful termination of the contracts. Plaintiff filed a counterclaim against GMB, seeking the return of $63,794,832.09 it paid under the contracts, plus interest. Plaintiff did not file a counterclaim against Kang and Kim, and did not seek to pierce GMB's corporate veil.

On December 13, 2016, the KCAB issued an award in favor of plaintiff and against GMB in the amount of $32,416,494.56, plus interest, based on the arbitration panel's conclusion GMB failed to perform under the contracts.[3]

3.    <u>The Arbitration Award Confirmation Litigation.</u>

On January 30, 2019, plaintiff filed a verified complaint in the Law Division against Hackenco, seeking confirmation of the KCAB arbitration

---

[3] In September 2015, GMB filed an arbitration claim against plaintiff before the KCAB arising from a contract in which GMB agreed to provide remotely operated vehicles (the ROV Arbitration). Plaintiff filed a counterclaim seeking to pierce the corporate veils of Hackenco and GMB and have Kang and Kim declared liable for any arbitration awards against those entities. On March 6, 2015, the arbitration panel entered an award in favor of GMB and denied the counterclaim. The panel determined plaintiff presented no evidence "as of June of 2011, when the contract in this matter was executed" Kang was "blending the assets or the business between [GMB] and himself, laws or by-laws were not observed to hold board meetings, or in decision-making processes, lack of company's capital, scale of the business or the number of employees." The panel also found "there has been no evidence . . . to show . . . Kang abused the corporate veil to avoid his financial obligations at the time the contract in this matter was executed."

award against it and a separate Law Division complaint against GMB, seeking confirmation of the arbitration award against it. Neither defendant filed an answer or responsive pleading.

On March 15, 2019, the court issued orders confirming both arbitration awards and entered judgments of $37,987,224.07 against GMB and $37,519,835.29 against Hackenco.

### 4. The Present Litigation.

On November 1, 2019, plaintiff filed a three-count amended complaint in the Law Division against defendants seeking to: (1) pierce the corporate veils of Hackenco and GMB and declare Kang, Kim, Bryant, DBNJW, 78 Roberts Road, and Primacy liable for the judgments against Hackenco and GMB; (2) set aside several transactions alleged to be fraudulent conveyances under the UFTA; and (3) declare Primacy a successor entity of GMB.[4]

In support of its amended complaint, plaintiff alleged that beginning in 2010 or 2011, the Kang Family transferred, sold, and/or gifted significant assets individually or through various entities, including Hackenco, GMB, DBNJW, and Primacy to avoid the debts of Hackenco and GMB to plaintiff. Plaintiff

---

[4] Plaintiff's original complaint was filed on September 23, 2019.

A-3728-23

alleged the transfers were made with funds Hackenco and GMB received from plaintiff under the contracts.

For example, in July 2012, Hackenco transferred a total of $770,000 to Kang's personal account. On December 18, 2012, GMB transferred $600,000, and then on December 28, 2012, $3.4 million, to the escrow account of Kang's attorney. Also on December 18, 2012, Hackenco transferred $1.3 million to the same attorney's escrow account.

On December 28, 2012, DBNJW, a limited liability company owned by Bryant and William, who were minors at the time, purchased real property in Alpine at which the Kang Family resided for $5,242,911. Kang admitted the funds used to purchase the property came from plaintiff's payments to Hackenco and GMB, and overlapped with the bribes he made.

On September 25, 2015, the Alpine property was sold for $7.9 million. The proceeds from the sale were not placed in DBNJW's bank account. Instead, the funds were moved in and out of a series of investment accounts and into an irrevocable trust for Bryant and William. DBNJW was dissolved on December 31, 2015.

On April 4, 2018, Kang, with funds from the above-mentioned investment accounts, purchased real property in Englewood Cliffs for $4 million. Title to

9

the property was put in the name of 78 Roberts Road, a limited liability company owned by Bryant, who was then twenty years old. The Kang Family resided at the property.

On May 6, 2019, 78 Roberts Road obtained a $2 million mortgage from defendant Recovco Mortgage Management, LLC, secured by the Englewood Cliffs property. $1.5 million of the mortgage proceeds were deposited in Bryant's personal bank account.

Between 2011 and 2017, Kang caused Hackenco and GMB to transfer $23,630,440 to the following Korean companies: Hackenco Korea, Co., Ltd., D.W. Inc., NDEC Korea, GMC Inc., and Golden Pig Inc. Kang caused GMB and Hackenco to transfer a total of $3,544,000 to D.W. Inc. between 2012 and 2015. At his deposition, Kang testified he was unaware of what D.W. Inc. was; then he claimed he knew what it was and might have owned an interest in it, but had no explanation for why he directed the transfer of millions of dollars to the entity. In fact, Kang owned D.W. Inc., which owned real estate in Seoul.

Plaintiff alleged other acts of comingling of the assets of GMB, Hackenco, and their affiliates through checks written as loans by and between the entities, as well as Primacy and 78 Roberts Road. Kang often treated GMB and Hackenco as one and the same when writing checks.

A-3728-23

In 2015, Primacy was formed by Jaewan Lee, an elderly retired engineer in Chicago, while Kang was serving a jail sentence in Korea. With funds traced to plaintiff's payments to GMB and Hackenco, Kang deposited $3.1 million in Primacy's account. Those funds were identified as notes payable on Primacy's 2018 tax return. Kang caused GMB's remaining assets to be transferred to Primacy through an asset purchase agreement dated January 2, 2017, for $200,000. Kang managed Primacy and, in bank records used to open accounts for Primacy, stated he owned 100% of the company. In unrelated legal proceedings, Primacy told various courts it was GMB's successor entity.

On July 8, 2022, plaintiff moved for summary judgment on all claims. Defendants cross-moved for summary judgment, arguing plaintiff's veil piercing claim was barred by collateral estoppel because plaintiff unsuccessfully raised that claim before the KCAB. Defendants also argued plaintiff's UFTA claims were time-barred.

On October 6, 2022, the court issued an oral decision granting summary judgment to plaintiff on its veil piercing claim. The court held:

> [T]he undisputed facts clearly demonstrate that [Kang and Kim] utilized the corporations, GMB and Hackenco, as their own individual funds. I mean, there's no doubt about it.

They fit squarely within the case law that talks about what you need to show and it's clearly been demonstrated here that they siphoned the funds of the corporations.

And, . . . going further than that, it certainly appears that they took steps to not only siphon[] the funds, but to protect the funds and place them in the name of others to preclude reaching those funds.

[T]hat's undisputed here. [T]here's no basis for people to put houses in the names of their minor children and such. But when you look in the context of this case, there's clearly a reason to do it.

So, I clearly find that there's no disputed issues of fact which would preclude piercing the corporate veil as to these individuals.

The court rejected defendants' argument plaintiff's veil piercing claim was barred by collateral estoppel. Referring to the outcome of the Hackenco arbitration proceeding, the court found plaintiff

didn't lose. . . . Sometimes you win, sometimes you lose, sometimes you get rained out. They got rained out.

Because I read the ruling . . . . It says here there was no arbitration agreement between [plaintiff and] . . . Kim and . . . Kang . . . . [W]hatever this arbitration agreement was, [the KCAB] could not consider it. So, they didn't decide it and say no to that. They just said we can't decide it because they're not a party to the arbitration.

. . . .

So, in that sense, . . . they didn't lose on it . . . . I don't think res judicata applies. Let me make that clear.

The court denied defendants' cross-motion on the timeliness of plaintiff's UFTA claims, concluding they "ha[d] not conclusively established [as] undisputed material fact[] that [plaintiff] was aware of the transfer of assets at the time of the arbitration proceeding in Korea, which resulted in the awards in 2016." Thus, the court concluded defendants had not established the one-year filing period from discovery of the fraudulent transfers established in N.J.S.A. 25:2-31(a) had run at the time plaintiff filed its complaint on September 23, 2019. See N.J.S.A. 25:2-31(a) (requiring a UFTA claim be filed "not later than four years after the transfer was made . . . or, if later, not later than one year after the transfer . . . was discovered by the claimant . . . .").

The court also denied plaintiff's motion for summary judgment on its UFTA claims, finding disputed issues of material fact precluded that relief. Finally, the court denied plaintiff's motion for summary judgment with respect to Primacy's status as successor of GMB. The court concluded disputed issues of material fact precluded that relief.

Shortly after the court issued its oral decision, plaintiff submitted an order for consideration under Rule 4:42-1(c). The proposed order included two paragraphs granting partial summary judgment to plaintiff on its UFTA claims

13

and finding there was no genuine dispute of material fact that seven transactions described in detail in the order "were made and were fraudulent within the meaning of the UFTA." Defendants, except for Primacy, objected to the paragraphs of the order granting partial summary judgment to plaintiff on its UFTA claims, arguing the court's oral decision denied plaintiff's motion on its UFTA claims.

On October 25, 2022, the motion court entered an order:

(1) granting plaintiff's motion for summary judgment, piercing the corporate veils of GMB and Hackenco, and finding Kang and Kim liable for the judgments against GMB and Hackenco;

(2) granting partial summary judgment to plaintiff on its UFTA claims by finding "there is no genuine dispute of material fact that the following transfers were made and were fraudulent within the meaning of the UFTA": (a) the December 2012 transfers of $3.4 million and $600,000 from GMB to DBNJW; (b) the December 2012 transfer of $1.3 million from Hackenco to DBNJW; (c) the April 2018 retransfer of $4 million from the proceeds of the sale of the property located in Alpine to purchase the property located in Englewood Cliffs; (d) the 2011 through 2017 net transfers from GMB and Hackenco in the amount of $2,544,000 to D.W. Inc.; (e) the 2013 and 2014 net transfers from Hackenco

14

to the Golden Pig, Inc. netting $100,000; (f) the $1.5 million transfer from 78 Roberts Road to Bryant; and (g) the May 6, 2019 transfer of $1.5 million from the mortgage proceeds of the Englewood Cliffs property to Bryant;

(3) denying without prejudice defendants' cross-motion for summary judgment to dismiss plaintiff's UFTA claims as untimely and directing plaintiff to file a motion addressing whether the statute of limitation defense should be decided by a jury or the court;

(4) denying plaintiff's UFTA motion with respect to $3.1 million in transfers between GMB and Primacy;

(5) denying plaintiff's motion for summary judgment on its claim to have Primacy declared the successor entity to GMB; and

(6) denying defendants' cross-motions for summary judgment.

On February 27, 2023, defendants moved for summary judgment on plaintiff's UFTA claim relating to the Alpine property on statute of limitations grounds and for reconsideration of the October 25, 2022 order to the extent it granted summary judgment in plaintiff's favor on its veil piercing claim with respect to Hackenco and GMB under collateral estoppel. Plaintiff cross-moved for summary judgment on the statute of limitations issue and to void defendants' fraudulent transfers.

On April 12, 2023, the court issued an oral decision:

(1) denying defendants' motion for summary judgment and granting plaintiff's cross-motion for summary judgment with respect to the timeliness of plaintiff's UFTA claim regarding the Alpine property. The court found plaintiff first discovered the wire transfers that led to the 2012 purchase of the Alpine property in 2019 and the filing of plaintiff's complaint on September 23, 2019, was therefore, timely; and

(2) denying defendants' motion to reconsider its prior order granting summary judgment in favor of plaintiff on its veil piercing claim. The court reiterated its finding the KCAB determined it lacked authority to decide plaintiff's veil piercing claim in the Hackenco arbitration. In addition, the court reviewed the decision of the arbitration panel in the ROV Arbitration and found the KCAB concluded an absence of evidence supporting piercing GMB's corporate veil as of June 2011, and not thereafter. The motion court concluded that because plaintiff's veil piercing claim was based on events that took place after June 2011, that claim was "never considered in the ROV [A]rbitration and, as such, cannot be banned herein." An April 12, 2023 order memorialized the motion court's decision.

After entry of the April 12, 2023 order, the issues remaining for the jury were: (1) whether Primacy was GMB's successor; and (2) whether $3.1 million in payments from GMB to Primacy were fraudulent transfers.

Following a six-day jury trial, the jury delivered a verdict unanimously finding Primacy was GMB's successor. The jury also unanimously found all the transfers before them were fraudulent.

On June 17, 2024, the court entered judgment in favor of plaintiff against Kang and Kim, jointly and severally, in the amount of $356,144.53; against Kim as custodian for Bryant, in the amount of $810,000; against Kim as custodian for William, in the amount of $100,000; against GMB in the amount of $2,219,198.49; and against DBNJW in the amount of $2,000.

On July 26, 2024, the court entered an order piercing the corporate veils of GMB and Hackenco, declaring Kang and Kim liable for the debts of the companies, ordering judgments in the amounts consistent with the June 17, 2024 order, plus pre- and post-judgment interest, and voiding the transfers listed in the October 25, 2022 order.

Kang, Kim, Bryant, William, GMB, Hackenco, DBNJW, and 78 Roberts Road appealed from the July 26, 2024 judgment, as well as the October 25, 2022, and April 12, 2023 orders. Primacy filed a separate appeal from the July 26,

2024 judgment, as well as the October 25, 2022, and April 12, 2023 orders. We subsequently granted the parties' motion to consolidate the appeals.

Defendants filed a joint brief arguing the motion court erred when it: (1) granted summary judgment to plaintiff on its veil piercing claim and found Kang and Kim personally liable for the debts of Hackenco and GMB because the claim was barred by collateral estoppel; (2) did not dismiss as time-barred plaintiff's UFTA claim arising from the 2012 transfers from GMB to DBNJW or any subsequent transferee; (3) granted summary judgment to plaintiff on its veil piercing claim; and (4) granted summary judgment to plaintiff on its UFTA claims. Defendants did not challenge the jury verdict.[5]

---

[5] Defendants, except for Primacy, filed a case information statement indicating they were appealing from the January 27, 2023 order granting summary judgment to plaintiff on their counterclaim alleging unjust enrichment. Their brief, however, contains a footnote stating defendants withdrew the counterclaim "to the extent it remained in the case" without prejudice to pursuing it before the KCAB. We, therefore, consider defendants' appeal of the January 27, 2023 order waived. "[A]n issue not briefed is deemed waived." Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026); Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief).

## II.

1. <u>Piercing the Corporate Veil.</u>

Defendants argue the motion court erred when it rejected their contention – both when it granted plaintiff partial summary judgment and when it denied defendants' motion for reconsideration – that plaintiff was collaterally estopped from raising its veil piercing claim because it unsuccessfully raised that claim before the KCAB. We disagree.

We review a grant of summary judgment de novo and apply the same standard as the motion court. <u>Samolyk v. Berthe</u>, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" <u>Branch v. Cream-O-Land Dairy</u>, 244 N.J. 567, 582 (2021) (quoting <u>R.</u> 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>Friedman v. Martinez</u>, 242 N.J. 449, 472 (2020) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)). We do not defer to the motion court's legal

analysis or statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014). We review the record "based on our consideration of the evidence in the light most favorable to the parties opposing summary judgment." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

"As a general principle, [c]ollateral estoppel is that branch of . . . res judicata which bars relitigation of any issue which was actually determined in a prior action . . . ." In re Liquidation of Integrity Ins. Co., 214 N.J. 51, 66 (2013) (quoting Div. of Youth & Fam. Servs. v. R.D., 207 N.J. 88, 114 (2011)). For the doctrine to apply,

> the party asserting the bar must show that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceedings issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 521 (2006) (quoting In re Estate of Dawson, 136 N.J. 1, 20-21 (1994)).]

The court must also consider factors weighing against the application of collateral estoppel, including whether

the party against whom preclusion is sought could not have obtained review of the prior judgment; the quality or extent of the procedures in the two actions is different; it was not foreseeable at the time of the prior action that the issue would arise in subsequent litigation; and the precluded party did not have an adequate opportunity to obtain a full and fair adjudication in the prior action.

[Allen v. V & A Bros., Inc., 208 N.J. 114, 138 (2011) (quoting Olivieri, 186 N.J. at 523).]

"In appropriate circumstances, arbitration awards may be given collateral estoppel effect in subsequent judicial proceedings." Konieczny v. Micciche, 305 N.J. Super. 375, 384 (App. Div. 1997) (citing Nogue v. Est. of Santiago, 224 N.J. Super. 383, 385-86 (App. Div. 1988)). However, if an arbitration panel makes no findings on the issue, it will not apply, as "[a] party cannot be collaterally estopped from retrying an issue unless one knows the resolution of the issue in the prior proceeding." Martin Rush, Urology Assocs., P.A., v. Kuhn, Smith & Harris, Inc., 193 N.J. Super. 389, 395 (App. Div. 1984) (citing Ettin v. Ava Truck Leasing, Inc., 53 N.J. 463, 480 (1969)).

We agree with the motion court's finding the KCAB did not consider plaintiff's request to pierce Hackenco's corporate veil. The arbitration panel found it did not have the authority to decide the issue because Kang and Kim were not parties to the arbitration agreement. Plaintiff did not raise a veil

21

piercing claim in the arbitration with GMB that is the subject of his appeal. In the ROV Arbitration, the panel denied plaintiff's request to pierce GMB's corporate veil because there was no evidence presented Kang abused his authority at GMB at the time the contract was executed in 2011. Here, plaintiff's veil piercing claim was based on fraudulent transactions that took place after the ROV contract was executed. Thus, the claim on which the motion court granted summary judgment was not decided by the KCAB in the ROV Arbitration.[6]

Defendants also argue the motion court erred in granting summary judgment on plaintiff's veil piercing claim because, viewing the evidence in the light most favorable to defendants, a reasonable fact-finder could have found GMB and Hackenco were not so dominated by Kang that they could not exist separately. They also argue Hackenco's and GMB's failure to observe corporate formalities was insufficient to pierce their corporate veils, because such a failure is not unusual for closely-held entities. Defendants argue the record contained

---

[6] Defendants appealed from the April 12, 2023 order denying their motion for reconsideration of the October 25, 2022 order rejecting their collateral estoppel argument. Their brief, however, did not address the April 12, 2023 order or any precedents concerning reconsideration of interlocutory orders. We review the denial of a motion for reconsideration of an interlocutory order for an abuse of discretion. Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 263-64 (App. Div. 1987). Because we find no error in the motion court's October 25, 2022 order granting summary judgment to plaintiff on its veil piercing claim, we see no basis on which to disturb the April 12, 2023 order.

no evidence to support a finding Hackenco and GMB were undercapitalized and insufficient evidence to find the companies were merely conduits for Kang and Kim created only to shield them from liability. We are not persuaded.

Generally, "a corporation is a separate entity from its shareholders, and . . . a primary reason for incorporation is the insulation of shareholders from the liability of the corporate enterprise." State, Dep't of Env't Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983) (citation omitted) (first citing Lyon v. Barrett, 89 N.J. 294, 300 (1982); and then citing Adolf A. Berle, Jr., The Theory of Enterprise Entity, 47 Colum. L. Rev. 343 (1947)). However, "[a]n individual may be liable for corporate obligations if he was using the corporation as his alter ego and abusing the corporate form in order to advance his personal interests." Sean Wood, L.L.C. v. Hegarty Gp., Inc., 422 N.J. Super. 500, 517 (App. Div. 2011) (quoting Casini v. Graustein (In re Casini), 307 B.R. 800, 811 (Bankr. D.N.J. 2004)). A court may pierce the corporate veil "to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise evade the law." Ventron Corp., 94 N.J. at 500 (citation omitted) (first citing Telis v. Telis, 132 N.J. Eq. 25 (E. & A. 1942); then citing Trachman v. Trugman, 117 N.J. Eq. 167, 170 (Ch. 1934)).

23

"Veil piercing is an equitable remedy whereby 'the protections of corporate formation are lost' and the parent corporation may be found liable for the actions of the subsidiary." Verni ex rel. Burstein v. Harry M. Stevens, Inc, 387 N.J. Super. 160, 199 (App. Div. 2006) (quoting Interfaith Cmty. Org. v. Honeywell Int'l Inc., 215 F. Supp. 2d 482, 497 (D.N.J. 2002)).  The party seeking to pierce the corporate veil "bears the burden of proving that the court should disregard the corporate entity."  Tung v. Briant Park Homes, Inc., 287 N.J. Super. 232, 240 (App. Div. 1996) (citing Touch of Class Leasing v. Mercedes-Benz Credit of Can., Inc., 248 N.J. Super. 426, 441 (App. Div. 1991)).

To meet this burden, "a plaintiff must show that:  (1) one corporation is organized and operated as to make it a mere instrumentality of [a shareholder], and (2) the dominant [shareholder] is using the subservient corporation to perpetuate fraud, to accomplish injustice, or to circumvent the law."  Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171-72 (3rd Cir. 2002) (citing Craig v. Lake Asbestos of Que., Ltd., 843 F.2d 145, 149 (3d Cir. 1988); Major League Baseball Promotion Corp. v. Colour-Tex, Inc., 729 F. Supp. 1035, 1046 (D.N.J. 1990)).

To establish the first element, a party must show "not only . . . the potential to exercise control [over the subsidiary], but to exercise it to a substantial

24

degree." Craig, 843 F.2d at 150 (alteration and omission in original) (quoting

Phillip I. Blumberg, The Law of Corp. Grps: Tort, Contract, & Other Common

L. Probs. in the Substantive L. of Parent & Subsidiary Corps. § 10.02 at 187

(1987)). A court may consider factors such as

> gross undercapitalization . . . "failure to observe
> corporate formalities, non-payment of dividends, the
> insolvency of the debtor corporation at the time,
> siphoning of funds of the corporation by the dominant
> stockholder, non-functioning of other officers or
> directors, absence of corporate records, and the fact that
> the corporation is merely a facade for the operations of
> the dominant stockholder or stockholders."
>
> [Craig, 843 F.2d at 150 (alteration in original) (quoting
> Am. Bell Inc. v. Fed'n of Tel. Workers, 736 F.2d 879,
> 886 (3d Cir. 1984)).]

Considering the second element, the "hallmarks" of a dominant

shareholder's abuse of the subservient corporation "are typically the engagement

of the subsidiary in no independent business of its own but exclusively the

performance of a service for the [dominant shareholder] and, even more

importantly, the undercapitalization of the subsidiary rendering it judgment-

proof." OTR Assocs. v. IBC Servs., Inc., 353 N.J. Super. 48, 52 (App. Div.

2002) (citing Ventron Corp., 94 N.J. at 501).

Having reviewed the summary judgment record de novo, we are not

persuaded by defendants' arguments. Defendants did not dispute Kang used

Hackenco and GMB to commit crimes in the form of an international bribery scheme. Kang employed the companies to illegally obtain contracts and used payments from plaintiff on those contracts to bribe a corrupt official in the Korean Navy. As our Supreme Court explained,

> The purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, [Telis, 132 N.J. Eq. 25], to perpetrate fraud, to accomplish a crime, or otherwise to evade the law, [Trachman, 117 N.J. Eq. at 170].
>
> [Ventron Corp., 94 N.J. at 500.]

The record also establishes at the time Hackenco and GMB were receiving payments from plaintiff on their ill-gotten contracts, Kang caused the companies to transfer $5.3 million to his attorney's escrow account to fund the purchase of the Alpine residence for his family by an entity owned by his minor child. At his deposition, Kang could offer no explanation for authorizing the significant gift, feigning ignorance of the transaction. Three years later, the Alpine property was sold at a considerable profit and the proceeds were not returned to the entity that purchased the property, but through a series of transactions were diverted to an irrevocable trust for Bryant and William.

Kang also could not explain why he transferred approximately $23.6 million from Hackenco and GMB to affiliates, including D.W, Inc., which he

26

owned with Kim. Again, Kang, who admitted to having destroyed Hackenco's and GMB's business records, claimed he was unfamiliar with the entities to which the funds were directed, although he later admitted he might have an interest in D.W. Inc. Defendants were unable to produce any corporate records for Hackenco or GMB, such as resolutions or minutes detailing the significant flow of funds to entities owned by Kang, Kim, and their children.[7]

We affirm the October 25, 2022 order and the July 26, 2024 judgment to the extent they grant summary judgment to plaintiff on its claim to pierce the corporate veils of Hackenco and GMB and find Kang and Kim personally liable for the judgments arising from the KCAB arbitration awards.

2.     The Timeliness of Plaintiff's UFTA Claims.

Defendants argue it was error for the court to deny their motion to dismiss plaintiff's UFTA claims as time-barred. We disagree.

---

[7]  For the first time on appeal, defendants argue it was error to pierce the corporate veils of Hackenco and GMB because plaintiff had an adequate remedy at law. We decline to consider an argument not raised in the motion court. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) ("It is a well-settled principle that our appellate courts will decline to consider questions . . . not properly presented to the trial court . . . 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'") (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)).

N.J.S.A. 25:2-25(a)(1), the provision of the UFTA on which plaintiff relied, states:

> a. A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

N.J.S.A. 25:2-31(a), the limitations provision of the UFTA, provides:

> A claim for relief with respect to a transfer or obligation under this article is extinguished unless action is brought:
>
> a. Under [N.J.S.A. 25:2-25(a)(1)], not later than four years after the transfer was made or the obligation was incurred or, if later, not later than one year after the transfer or obligation was discovered by the claimant . . . .

The complaint was filed on September 23, 2019. Some of the fraudulent transactions alleged in the complaint took place within four years of the filing date. Defendants do not challenge the timeliness of plaintiff's claims with respect to those transactions. However, they argue the transactions alleged in the complaint that occurred more than four years before the filing date are time-barred because plaintiff discovered those claims more than a year before the complaint was filed.

28

Specifically, defendants argue plaintiff was aware of the basis for its fraudulent transfer claims relating to the 2012 transfers by Hackenco and GMB to DBNJW by March 2018, but did not file its complaint until more than a year later. Defendants argue the term "discovered" in N.J.S.A. 25:2-31 should be interpreted consistently with the common law discovery rule, i.e., that "a cause of action accrues 'when a plaintiff knows, or through the exercise of reasonable diligence, should know of the basis for a cause of action against an identifiable defendant.'" See Dimitrakopoulous v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 116 (2019) (quoting The Palisades at Fort Lee Condo. Ass'n, Inc. v. 100 Old Palisade, LLC, 230 N.J. 427, 447 (2017)).

Defendants' argument is contradicted by the statute's plain text and history. When enacted in 1988, the UFTA allowed a cause of action "with respect to a fraudulent transfer or obligation" to be brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." N.J.S.A. 25:2-31(a) (1988).

The original version of the statute was examined in SASCO 1997 NI, LLC v. Zudkewich, 166 N.J. 579 (2001). In SASCO, the Court held the Legislature intended the then-existing one-year limitation provision in the statute "to

29

incorporate the discovery rule jurisprudence applicable to fraud actions into the tolling provision of" N.J.S.A. 25:2-31(a). Id. at 590. The Court explained, "That intent demonstrates conclusively that the critical question is when a reasonable commercial creditor would have known about the [challenged] transfer, rather than whether" the plaintiff seeking to void the transaction "could, using reasonable means, have discovered the transfer." Ibid. Applying this interpretation of the discovery provision of the statute, the Court held that "[a] reasonable commercial creditor would have conducted an asset search" and identified the allegedly fraudulent transaction at the time the underlying loan was declared to be in default. Id. at 592.

Shortly after the Court issued its opinion in SASCO, the Legislature amended N.J.S.A. 25:2-31(a) to remove the phrase "or could reasonably have been" from the statute. L. 2002, c. 100, § 1 (eff. Nov. 18, 2002). As of September 23, 2019, a plaintiff has one year after an allegedly fraudulent transfer "was discovered" to file its complaint.[8]

Whether a statute of limitations bars a claim "is ordinarily a legal matter and 'traditionally within the province of the court.'" Baez v. Paulo, 453 N.J.

---

[8] After the complaint was filed, N.J.S.A. 2:25-31 was amended by L. 2021, c. 92, § 12. That amendment is not material to our analysis.

Super. 422, 436 (App. Div. 2018) (quoting Lopez v. Swyer, 62 N.J. 267, 274 (1973)). Because the interpretation of a limitations provision is a question of law, we review the issue de novo. Save Camden Pub. Schs. v. Camden City Bd. of Educ., 454 N.J. Super. 478, 487 (App. Div. 2018) (citing Catena v. Raytheon Co., 447 N.J. Super. 43, 52 (App. Div. 2016)). We owe "no deference to [the] trial judge's legal interpretations" in deciding whether a claim is time-barred. Id. at 487-88 (alteration in original) (quoting Giannakopoulos v. Mid State Mall, 438 N.J. Super. 595, 600 (App. Div. 2014)).

"[W]hen interpreting a statute, [a court's] overriding goal must be to determine the Legislature's intent." White v. Mattera, 175 N.J. 158, 165 (2003) (first alteration in original) (quoting Hubbard v. Reed, 168 N.J. 387, 392 (2001)). "As a general rule, the Court must first look to the plain language of the statute." Ibid. (citing Hubbard, 168 N.J. at 392). "If that language is clear on its face, 'the sole function of the court[] is to enforce it according to its terms.'" Ibid. (alteration in original) (quoting Couri v. Gardner, 173 N.J. 328, 334 (2002)). If the language of a statute is unclear or ambiguous, courts may look at secondary sources, such as legislative history or sponsors' statements, for guidance. Marino v. Marino, 200 N.J. 315, 329 (2009) (citing Daidone v. Buterick Bulkheading, 191 N.J. 557, 565-66 (2007); Cox v. Sears Roebuck &

Co., 138 N.J. 2, 15 (1994); Panzino v. Cont'l Can Co., 71 N.J. 298, 301-03 (1976)).

Both the plain language of the statute when the complaint was filed and the 2002 amendment make clear the legislative intent to tie the start of the one-year limitations period to a plaintiff's obtaining actual knowledge of facts sufficient to allege a UFTA claim.

Plaintiff first learned of DBNJW's involvement in this matter in a 2016 report prepared by a law firm it retained to investigate the assets of Kang, Kim, GMB, and Hackenco. While the memo identified the Alpine property as an asset of DBNJW and noted the entity was owned by Bryant, it did not identify the source of the funds DBNJW used to purchase the property. In the absence of knowledge of the bank transfers which funded the purchase of the Alpine property, or evidence connecting Hackenco and GMB to the purchase, the 2016 report did not give plaintiff a basis to allege a UFTA claim. Notably, Rule 4:5-8 requires allegations of fraud to be pled with specificity. See also Jecker v. Hidden Valley, Inc., 422 N.J. Super. 155, 164 (App. Div. 2011) (noting plaintiff alleging a UFTA claim "bears the burden of providing the transfer was fraudulent by clear and convincing evidence.").

The specific transfers leading to the purchase of the Alpine property, established through wire confirmations, checks and bank statements, were discovered by plaintiff through subpoenas it sent after it obtained orders confirming the KCAB arbitration awards in 2019. As of the 2016 report, plaintiff knew only the Alpine property was owned by an entity owned by Bryant. That information was insufficient to state a UFTA claim. We therefore affirm the April 12, 2023 order to the extent it denied defendants' motion to dismiss plaintiff's UFTA claims as time-barred and granted plaintiff's cross-motion on that point.

3.    Order Granting Summary Judgment
       on Plaintiff's UFTA Claims.

Lastly, we agree with defendants' argument the motion court erred when it granted summary judgment to plaintiff on its UFTA claims.

A transfer made by a debtor is considered fraudulent and may be voided if it is made

> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor or;
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the

33

debtor were unreasonably small in relation to the business or transaction; or

(b) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

[N.J.S.A. 25:2-25(a).]

Fraud claims are "fact-specific determinations that must be resolved on a case-by-case basis." Gilchinsky v. Nat'l Westminster Bank N.J., 159 N.J. 463, 476 (1999). In determining a party's intent, "courts generally look to factors commonly referred to as 'badges of fraud.'" Ibid. These "badges of fraud" include:

a. The transfer or obligation was to an insider;

b. The debtor retained possession or control of the property transferred after the transfer;

c. The transfer or obligation was disclosed or concealed;

d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e. The transfer was of substantially all the debtor's assets;

f. The debtor absconded;

g. The debtor removed or concealed assets;

34

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[Id. at 476-77 (quoting N.J.S.A. 25:2-26).]

The presence of any of these badges

do not of themselves or per se constitute fraud, but they are facts having a tendency to show the existence of fraud [. . . .]  Often, a single one of them may establish and stamp a transaction as fraudulent.  When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent. . . .

[Gilchinsky, 159 N.J. at 476 (alteration in original) (quoting Schall v. Anderson's Implement, Inc., 484 N.W.2d 86, 91 (Neb. 1992) (emphasis added)).]

Even when these badges are present, a party still must show the intent to commit fraud.  N.J.S.A. 25:2-25.  When one party alleges fraud

and must probe the conscience of the moving party . . . to prove his case, or in any case where the subjective elements of willfulness, intent or good faith of the

35

moving party are material to the claim . . . , a conclusion from papers alone that palpably there exists no genuine issue of material fact will ordinarily be very difficult to sustain.

[In re Est. of DeFrank, 433 N.J. Super. 258, 266-67 (App. Div. 2013) (quoting Judson v. Peoples Bank & Tr. Co., 17 N.J. 67, 76 (1954)).]

"Thus, it is clear that questions of a party's state of mind, knowledge, intent or motive should not generally be decided on a summary judgment motion." Ibid. (quoting Garden St. Bldgs. v. First Fid. Bank, 305 N.J. Super. 510, 527 (App. Div. 1997)).

Our review of the record uncovered insufficient support for the court's summary judgment award to plaintiff on its UFTA claims. The first two transfers on which the court granted summary judgment were from GMB and Hackenco to DBNJW and totaled $5.3 million. The transfers satisfy many of the badges of fraud, including being made to an insider, remaining in the debtor's possession or control, and lacking consideration in return for the transfers. N.J.S.A. 25:2-26. However, the transfers were made prior to the arbitration claims and awards, and a jury could reasonably conclude the transfers were made without the intent to hinder, delay or defraud a creditor or the intent to incur a debt beyond GMB or Hackenco's ability to pay.

36

In addition, the origin of the funds used to purchase the Englewood Cliffs property was disputed: defendants claimed the money came from the sale of other properties in Georgia, West New York, and Old Tappan, and funds Kang gifted to his children, but plaintiff claimed the money came from the proceeds of the sale of the Alpine property. A jury could have reasonably adopted defendants' version of events leading to the purchase of the Englewood Cliffs property.

Defendants claimed the transfers to and from the Golden Pig related to a contract for a restaurant. Plaintiff asserted the transfers had no legitimate purpose. Defendants' explanation is plausible, since Hackenco transferred $100,000 more to the Golden Pig than was returned a year later. A jury could reasonably conclude the returned funds were, as claimed by defendants, a partial payment for services rendered or goods delivered under the contract.

Similarly, Kang claimed the transfers involving D.W. Inc. were related to a contract with Hackenco. Plaintiff argued the transactions lacked a legitimate purpose and no consideration was exchanged. A jury could reasonably conclude these transfers were related to legitimate real estate contracts between the companies.

The motion court provided minimal findings of fact and conclusions of law supporting its grant of summary judgment on plaintiffs' UFTA claims. In fact, the court's oral decision denied plaintiff's motion, concluding there were disputed issues of material fact precluding entry of summary judgment. However, the court subsequently issued an order granting the motion. The order was not accompanied by oral or written findings of fact and conclusions of law explaining the court's reasoning.

Rule 1:7-4(a) provides a trial court "shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury." "[A]n articulation of reasons is essential to the fair resolution of a case." Schwarz v. Schwarz, 328 N.J. Super. 275, 282 (App. Div. 2000). Effective appellate review of a trial court's decision requires examination of the findings of fact and conclusions of law on which the court relied. See Raspantini v. Arocho, 364 N.J. Super. 528, 532 (App. Div. 2003). We are unable to determine on this record the basis on which the motion court determined each of the transactions addressed in the October 25, 2022 order met the criteria in the UFTA to warrant being voided. We therefore vacate the October 25, 2022 order to the extent it granted summary judgment to plaintiff

on its UFTA claims, and July 26, 2024 judgment to the extent it incorporated that aspect of the October 25, 2022 order.

To the extent we have not specifically addressed any of defendants' remaining contentions, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division